IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

————————————

No. 01-20333

————————————

E. & J. GALLO WINERY,

Plaintiff - Appellee,

v.

SPIDER WEBS LTD.; STEVE E. THUMANN;
PIERCE A. THUMANN; FRED H. THUMANN, Trustee,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

April 3, 2002

Before GARWOOD, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Ernest and Julio Gallo Winery ("Gallo") holds a trademark in the name "Ernest & Julio Gallo." Spider Webs Ltd. registered the internet domain name "ernestandjuliogallo.com" (the "domain name"). Gallo sent Spider Webs a letter requesting that they release or transfer the domain name to Gallo, but Spider Webs refused to do so. Gallo sued Spider Webs under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), and under federal and Texas anti-dilution, trademark infringement, and unfair competition laws. After this litigation began, Spider Webs hosted

1

a web site at the domain name that was critical of this litigation, of alcohol, and of corporate America. The parties consented to proceed before a magistrate judge, who granted summary judgment to Gallo on the ACPA and Texas Anti-Dilution Statute ("ADS") claims, issued an injunction under the ADS, ordered the transfer of the domain name to Gallo under the ACPA, and awarded statutory damages to Gallo under the ACPA. Spider Webs appeals. We AFFIRM.

I

Ernest & Julio Gallo Winery ("Gallo") registered the trademark "Ernest & Julio Gallo" on October 20, 1964 with the United States Patent and Trademark Office, as Registration Number 778,837. Gallo has registered a number of other trademarks, as well as internet domain names, but had not registered the domain name at issue here. It is no surprise to us that Gallo has sold more than four billion bottles of wine and has spent more than $500 million promoting its brands. On the other hand, the individual defendants, brothers Steve and Pierce Thumann, and their father, Fred Thumann, trustee, run a family-owned prehanging millwork business named Doortown, Inc. In June 1999, they created Spider Webs Ltd. as a limited partnership. According to Steve Thumann, Spider Webs's business plan is to develop internet address names. It has registered more than 2000 internet domain names through Network Solutions, Inc., one of the companies responsible for the registration of internet domain names. Approximately 300 of these contained names that could be associated with existing businesses, including "ernestandjuliogallo.com," "firestonetires.com," "bri dgestonetires.com," "bluecross-blueshield.com," "oreocookies.com," "avoncosmetics.com," and others. As the trial court found, because internet domain names cannot contain ampersands or spaces, and because all internet domain names must end in a top-level domain such as ".com," ".org," ".net," etc., "ernestandjuliogallo.com" is effectively the same thing as "Ernest & Julio Gallo." E. & J. Gallo

2

Winery v. Spider Webs Ltd., 129 F.Supp.2d 1033, 1041 (S.D. Tex. 2001). Spider Webs sells some of the names it has registered on its web site and on the internet auction site Ebay (and apparently has refused to accept any bids of less than $10,000), although it has not yet offered "ernestandjuliogallo.com" for sale. Steve Thumann admitted in his deposition that "ernestandjuliogallo.com" is valuable because of the goodwill that Gallo had developed in its name, and that when they registered this domain name they "hoped that Gallo would contact us and we could assist them in some way." However, Spider Webs did not initiate any contact with Gallo, nor did it attempt to sell the domain name to Gallo.

Approximately six months after Gallo brought this lawsuit, Spider Webs published a website at "ernestandjuliogallo.com" that discussed the lawsuit, the risks associated with alcohol use, and alleged misrepresentations by corporations. It contained a picture of the upper half of a wine bottle with the words "Whiney Winery" ("the Whiney Winery website"). It had links to a number of other pages on the site, including: an Alcohol Awareness page that discussed the dangers of alcohol; an "Our Mission" page that was critical of corporate America; a "Press Release" about the lawsuit; and a letter from a Gallo lawyer. Although the first page contained a disclaimer that stated "This Site Is Not Affiliated With Ernest & Julio Gallo (R) Wineries," none of the other linked pages did. As of the date of the trial court's opinion, typing in "www.ernestandjuliogallo.com" as the address on a web browser led a user to a website entitled "SpinTopic." Spider Webs states that the SpinTopic website is owned by it and is a noncommercial, nonprofit, consumer information site.

II

After the defendants registered the domain name, Gallo sent a letter to Spider Webs, requesting that they release or transfer to Gallo the domain name, but Spider Webs refused to do so.

3

On February 11, 2000, Gallo filed suit against Spider Webs Ltd., Steve Thumann, Pierce Thumann, and Fred Thumann, Trustee (collectively, "Spider Webs"), alleging violations of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), trademark dilution under federal and Texas law, see Texas Anti-Dilution Statute, Tex. Bus. & Com. Code § 16.29, trademark infringement under federal and Texas law, and unfair competition under federal and Texas law. Approximately six months later, Spider Webs published the Whiney Winery website at "ernestandjuliogallo.com." On August 31, 2000, Gallo moved for partial summary judgment on its claims of violations of the Texas Anti-Dilution Statute and the ACPA. The magistrate judge granted summary judgment to Gallo on these claims, holding that under the Texas ADS Gallo owned a distinctive mark and Spider Webs's actions created a likelihood of dilution of that mark, thereby violating the ADS. E. & J. Gallo, 129 F.Supp.2d at 1037-42. The trial court further held that the ACPA was constitutional, that Spider Webs had registered the domain name in bad faith under the ACPA's standard, that Spider Webs's use was not a fair use, and therefore Spider Webs had violated the ACPA. Id. at 1042-48. The court ordered the defendants to transfer the domain name to Gallo within ten days from the entry of judgment, as allowed by the ACPA, see 15 U.S.C. § 1125(d)(1)(C), and entered a permanent injunction under the ADS restraining them "from using the Internet domain name 'ERNESTANDJULIOGALLO.COM,' registering any domain name that contains the word 'Gallo,' and registering any Internet domain name that contains the words 'Ernest' and 'Julio' in combination." Id. at 1048. The court also awarded Gallo $25,000 in statutory damages under the ACPA, plus post-judgment interest and costs. The court granted Gallo's unopposed motion to dismiss the rest of its claims, without prejudice. Spider Webs moved for a new trial, which the

4

magistrate judge denied. Spider Webs then filed this appeal.[1]

III

We review the trial court's grant of summary judgment to Gallo on its ACPA claim de novo, applying the same standard as the district court. Mississippi River Basin Alliance v. Westphal, 230 F.3d 170, 174 (5th Cir. 2000). Summary judgment is appropriate if "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "This Court will consider the evidence in the light most favorable to the non-movant . . . . [I]f no reasonable juror could find for the non-movant, summary judgment will be granted." Mississippi River Basin, 230 F.3d at 174.

Spider Webs does not appeal the holdings that Gallo had a valid registration in its mark, that the mark is famous and distinctive, and that the domain name registered by Spider Webs is identical or confusingly similar to Gallo's mark. However, Spider Webs argues that they did not act with a "bad faith intent to profit," as required by the ACPA. The ACPA prohibits "cybersquatting" by providing that:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
> (i) has a bad faith intent to profit from that mark, including a personal name which is

---

[1]Gallo argues that Spider Webs's appeal is untimely. The magistrate judge entered her memorandum and order granting partial summary judgment to Gallo on January 29, 2001, and entered final judgment on February 6. Spider Webs moved for a new trial on February 16, and the magistrate judge denied this motion on March 19. Spider Webs filed a notice of appeal on March 28. Under FRAP 4(a)(1)(A), a notice of appeal must be filed "within 30 days after the judgment or order appealed from is entered." If a party timely moves for a new trial under Fed. R. Civ. P. 59, then "the time to file an appeal runs for all parties from the entry of the order disposing of" the motion for a new trial. FRAP (a)(4)(A)(v). Spider Webs moved for a new trial within ten days of the entry of judgment as required by Fed. R. Civ. P. 59(b). After this motion was denied, Spider Webs appealed within thirty days of the entry of this order. Therefore, Spider Webs's appeal is timely.

5

protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that--

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A). In order to determine whether someone has acted in bad faith under the

ACPA,

a court may consider factors such as, but not limited to

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i). The ACPA also provides a fair use defense: "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).[2] If a court finds a violation of the ACPA, it may order the transfer of the domain name to the owner of the mark and may award statutory damages. See 15 U.S.C. §§ 1125(d)(1)(C), 1117(d).

We turn now to consider the listed bad-faith factors as they apply to this case. Spider Webs has no intellectual property rights or trademark in the name "ernestandjuliogallo," aside from its registered domain name. The domain name does not contain the name of Spider Webs or any of the other defendants. Spider Webs had no "prior use" (or any current use) of the domain name in connection with the bona fide offering of goods or services. Under the fourth factor, Spider Webs's use is commercial, and there is no indication that it is a fair use. Steve Thumann admitted that the domain name was valuable and that they hoped Gallo would contact them so that they could "assist" Gallo in some way. Further, at least two other courts have found that when a defendant registers a domain name that is identical to someone else's trademarked name and thereby impacts the trademark owner's business by preventing internet users from reaching the trademark owner's own web site,

---

[2]At trial, Spider Webs argued that the ACPA bad faith standard could not be applied to them because they registered the domain name before the effective date of the ACPA. They do not make this argument on appeal, so they have abandoned it. However, even if they had not abandoned this argument, it would still be unsuccessful. They registered the domain name on August 26, 1999. The ACPA was passed on November 29, 1999, but it states that it applies to "all domain names registered before, on, or after the date of enactment of this Act." 1999 Acts, P.L. 106-113, § 3010, 113 Stat. 1536. The statute applies to "use" of a mark, see 15 U.S.C. § 1125(d)(1)(A)(I)(ii), and Spider Webs "used" the mark when it hosted the Whiney Winery website at the domain name in August 2000, after the effective date of the ACPA. Therefore, the statute applies to their use of the mark.

7

this is impacts the trademark owner's business and is a use "'in connection' with goods and services." People for the Ethical Treatment of Animals v. Doughney, 113 F.Supp.2d 915, 919 (E.D. Va. 2000) ("PETA") (citing Planned Parenthood Federation of America, Inc. v. Bucci, 42 U.S.P.Q.2d 1430, 1435 (S.D.N.Y. 1997)) ("'[I]t is likely to prevent Internet users from reaching [PETA]'s own Internet web site. The prospective users of [PETA]'s services who mistakenly access Defendant's web site may fail to continue to search for [PETA]'s own home page, due to anger, frustration, or the belief that the Plaintiff's home page does not exist.'").

Additionally, there is uncontradicted evidence that Spider Webs was engaged in commerce in the selling of domain names and that they hoped to sell this domain name some day. Although Spider Webs did not offer "ernestandjuliogallo.com" for sale, it has offered for sale other domain names that it has registered. Steve Thumann stated that Spider Webs intended to wait until the ACPA is declared unconstitutional before selling the domain name here. E. &. J. Gallo, 129 F.Supp.2d at 1046. Spider Webs admitted that Gallo had a valuable trademark, and that when they registered the domain name they hoped Gallo would contact them so they could "assist" Gallo. Indeed, the Ninth Circuit had found that one can be in the "business" of "register[ing] trademarks as domain names and then sell[ing] them to the rightful trademark owners." Panavision Intern., L.P. v. Toeppen, 141 F.3d 1316, 1325 (9th Cir. 1998). The ACPA was passed to address situations just like this one: "For example, many cybersquatters are now careful to no longer offer the domain name for sale in any manner that could implicate liability under existing trademark dilution law. And, in cases of warehousing and trafficking in domain names, courts have sometimes declined to provide assistance to trademark holders, leaving them without adequate and effective judicial remedies." Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 495-96 (2d Cir. 2000) (quoting

8

S. Rep. No. 106-140, at 7 (1999), on the ACPA).[3]

Additionally, there is no evidence that Spider Webs actually used the domain name until after the lawsuit began. The Second and Third Circuits have indicated that when a registrant first uses a web site after litigation begins, this undermines any claim that the use was in good faith or was a fair use under the ACPA. See Sporty's Farm L.L.C., 202 F.3d at 499 (considering bad faith factors and finding bad faith); Shields v. Zuccarini, 254 F.3d 476, 485-86 (3d Cir. 2001) (same). Under the fifth bad faith factor, the fact that Spider Webs hosted a website using Gallo's trademarked name, at which it disparaged the instant litigation and alcohol, is evidence of intent to harm Gallo's goodwill and to tarnish its mark. See, e.g., PETA, 113 F.Supp.2d at 920 ("Defendant clearly intended to confuse, mislead and divert internet users into accessing his web site which contained information antithetical and therefore harmful to the goodwill represented by the PETA mark.") Under the sixth and eighth factors, although Spider Webs has not offered this domain name for sale, it has registered other domain names that are identical or similar to the names of well-known businesses and products, has offered other domain names for sale, and has refused to accept less than $10,000 per name. These factors all favor a finding of bad faith. Under factor seven, there is no evidence that Spider Webs provided misleading contact information.

Finally, as to the last factor, there was evidence presented that Gallo's mark is distinctive and famous. See 15 U.S.C. § 1125(c)(1) (listing factors to consider). Further, Gallo registered the mark, which is a family name, thirty-eight years ago, and other courts have found that "'Gallo' has clearly

_____

[3]Spider Webs also argues that "use" under the ACPA must be commercial use, as evidenced by the "bad faith intent to profit" requirement, and that their use was purely non-commercial. The trial court found that the ACPA does not require commercial use. E. & J. Gallo Winery, 129 F.Supp.2d at 1047-48. Because we find that Spider Webs's use was commercial, we need not reach this issue.

become associated with wine in the United States such that its evolution to 'secondary meaning' status may not be seriously questioned." E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F.Supp. 457, 462 (N.D. Cal. 1991). In sum, seven of the nine statutory factors strongly support a finding of bad faith.

Additionally, this court is not limited to the consideration of the listed statutory factors, but can consider other factors as well. See 15 U.S.C. § 1125(d)(1)(A)(i) (court can consider factors "such as, but not limited to" the listed statutory factors). For example, "[w]hen the senior user's trademark is famous in the marketplace and where the junior user was aware of the trademark and of its fame, a presumption of bad faith arises from the choice of the same name because it is inferrable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark." E. & J. Gallo Winery v. Gallo Cattle Co., 12 U.S.P.Q.2d 1657, 1675 (E.D. Cal. 1989), aff'd, 967 F.2d 1280 (9th Cir. 1992). The circumstances of this case all indicate that Spider Webs knew Gallo had a famous mark in which Gallo had built up goodwill, and that they hoped to profit from this by registering "ernestandjuliogallo.com" and waiting for Gallo to contact them so they could "assist" Gallo.

Considering the statutory factors and all the circumstances of this case, the trial court's conclusion that Spider Webs acted with a bad faith intent to profit and its grant of summary judgment to Gallo on this issue were appropriate.[4]

IV

_____

[4]Although Spider Webs argues on appeal that the ACPA violates the First Amendment, it did not make this argument before the trial court and therefore it has forfeited this issue. See Simon v. United States, 891 F.2d 1154, 1159 (5th Cir. 1990). Spider Webs argued to the trial court that the ACPA constitutes a taking and is impermissibly retroactive, but it has not raised these issues before this court and therefore has abandoned them.

10

Spider Webs also argues that the trial court should not have awarded Gallo $25,000 in statutory damages under the ACPA because Gallo did not suffer any actual injury. We review a trial court's award of damages for clear error. St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402, 410 (5th Cir. 2000).

The United States trademark laws provide that:

In a case involving a violation of section 1125(d)(1) of this title [the ACPA], the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

15 U.S.C. § 1117(d). Spider Webs notes that under the ACPA and applicable portions of § 1117, damages "shall not be available with respect to the registration, trafficking, or use of the domain name that occurs before the date of the enactment of this Act [November 29, 1999]." 1999 Acts, P.L. 106-113, § 3010, 113 Stat. 1536. They argue that because they registered the domain name prior to enactment of the ACPA, they cannot be liable. However, the evidence before the trial court demonstrated that Spider Webs "used" the domain name at least since August 15, 2000, when it hosted the "Whiney Winery" website at the domain name. See, e.g., Shields, 254 F.3d at 486-87 (continued use of domain name confusingly similar to a trademarked name after the ACPA's effective date entitled the trademark owner to statutory damages). Therefore, although Spider Webs registered the domain name before the effective date of the ACPA, because they used the domain name after this date, they can be held liable for statutory damages for this use.

In Shields, the Third Circuit affirmed an award of statutory damages of $10,000 per infringing domain name for the five infringing domain names in that case. Id. The defendant in Shields stated that he only used the infringing names for sixty days, but the Third Circuit noted that there was no

11

requirement that the court consider the duration of the infringement when calculating statutory damages, and that the court could award damages as it considered "just" under the statute. Id. at 487. These considerations indicate that the award of damages here was not in clear error.

The statutory damages provisions in the ACPA, which is relatively new, are akin to the statutory damages provisions of the copyright laws.[5] In copyright law, the Supreme Court has said that the "statutory [damages] rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct." F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233 (1952). In this case, although Gallo did not present evidence that it actually lost any business due to Spider Webs's actions, the trial court found that Spider Webs's actions put Gallo "at risk of losing business and of having its business reputation tarnished." E. & J. Gallo Winery, 129 F.Supp.2d at 1048. The award of $25,000 in statutory damages in response to the defendants' conduct is not clear error.

V

The trial judge also found that the Texas Anti-Dilution Statute ("ADS") applies to non-commercial activities, and that Spider Webs's conduct violated the ADS. The trial court issued an injunction against Spider Webs, as allowed by the Texas ADS. See Tex. Bus. & Comm. Code. § 16.29. We review the trial court's grant of summary judgment on this issue de novo. See Mississippi

---

[5]See 17 U.S.C. § 504(c)(1): "[T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. . . ." The copyright laws also provide for statutory damages of up to $150,000 per violation if the infringement was willful, and for damages of as little as $200 if the infringement was unknowing. See 17 U.S.C. § 504(c)(2).

River Basin, 230 F.3d at 174. Because we have found that Spider Webs's use was commercial, we need not decide whether the ADS applies to non-commercial activities. We agree with the trial court, however, that Spider Webs's use violated the ADS.

The Texas ADS provides that:

A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services. An injunction sought under this section shall be obtained pursuant to Rule 680 et seq. of the Texas Rules of Civil Procedure.

Tex. Bus. & Comm. Code § 16.29 ("Injury to Business Reputation or Trade Name or Mark"). In order to succeed on a dilution claim, Gallo must show that it owns a distinctive mark and that there is a likelihood of dilution. Pebble Beach Co. v. Tour 18 I, Ltd., 942 F.Supp. 1513, 1564 (S.D. Tex. 1996), aff'd as modified, 155 F.3d 526 (5th Cir. 1998) (citing Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 506 (2nd Cir. 1996)). As discussed previously Gallo has validly registered "Ernest & Julio Gallo," and there is no serious dispute that the mark is distinctive and has acquired a secondary meaning. However, Gallo must also show a likelihood of dilution. There are not many cases interpreting the Texas Anti-Dilution statute, so this court has previously looked to "the general law of dilution . . . in construing the Texas Statute." Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1081 (5th Cir. 1997). A likelihood of dilution can be caused by either "1) 'blurring,' a diminution in the uniqueness or individuality of the mark, or 2) 'tarnishment,' an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the plaintiff's mark." Id. (citations omitted). Other courts have found that when a defendant prevents a plaintiff from identifying its goods and services on the internet, this

13

constitutes dilution. See, e.g., Sporty's Farm, 202 F.3d at 495; Panavision Intern., 141 F.3d at 984; Intermatic, Inc. v. Toeppen, 947 F.Supp 1227, 1240 (N.D. Ill. 1996). Spider Webs's use of Gallo's mark as an internet domain name did just that.

The evidence here showed that the "Whiney Winery" website posted by Spider Webs at the domain name was critical of the instant litigation and of alcohol consumption, contained crude formatting and misspellings, and only contained a disclaimer that the web page was not associated with Gallo on the opening page, but not on other pages. Spider Webs asserts that this page was only available for forty-eight hours, but, as the trial court found, there is no evidence in the record to support this. Gallo does not complain because Spider Webs was critical of Gallo, but rather because Spider Webs sought to associate the Gallo trademark with the contents of its web site and because Spider Webs prevented Gallo from using its mark to identify its goods and services on the internet. These acts, if associated with Gallo due to Spider Webs's use of Gallo's trademarked name, could harm Gallo's reputation and goodwill. Although Spider Webs alleges that Gallo has not shown any actual injury, under the ADS all that Gallo must show is a likelihood of dilution, and Gallo has done so. Summary judgment for Gallo on this issue was proper as well.

VI

Finally, Spider Webs argues that the injunction the trial court issued against them is overly broad. We review the trial court's grant of a permanent injunction for abuse of discretion. Cox v. City of Dallas, Tex., 256 F.3d 281, 289 (5th Cir. 2001) (citing Hopwood v. Texas, 236 F.3d 256, 276 (5th Cir. 2000)).

As noted previously, the trial court permanently enjoined the defendants under the Texas ADS "from using the Internet domain name 'ERNESTANDJULIOGALLO.COM,' registering any domain

14

name that contains the word 'Gallo,' and registering any Internet domain name that contains the words 'Ernest' and 'Julio' in combination." E. & J. Gallo, 129 F.Supp.2d at 1048. The Texas Anti-Dilution Statute allows for injunctions. See Tex. Bus. & Com. Code § 16.29. Under Texas law, injunctive relief is appropriate where the applicant demonstrates: "1) the existence of a wrongful act; 2) the existence of imminent harm; 3) t he existence of irreparable injury; and 4) the absence of an adequate remedy at law." Hues v. Warren Petroleum Co., 814 S.W.2d 526, 529 (Tex.App.--Houston [14th Dist.] 1991, writ denied) (citing Priest v. Texas Animal Health Comm'n, 780 S.W.2d 874, 875 (Tex.App.--Dallas 1990, no writ)). Spider Webs's actions are wrongful under the Texas ADS, as discussed previously. At least one other federal court has found that a defendant's unauthorized use of a plaintiff's trademark on the internet to disseminate views contrary to the plaintiff's would result in imminent irreparable harm without an injunction:

> The use of the Mark and the Name of the Plaintiff Organization by the Defendant has interfered with the ability of the Plaintiff to control the Mark and the Name of the Plaintiff Organization. This in turn creates the potential for damage to the reputation of the Plaintiff Organization, especially in light of the disparaging comments the Defendant and the Outreach Judaism Organization have made. The Plaintiff Organization should not be required to leave its reputation in the hands of the Defendant, especially when the Defendant intends to destroy the reputation of the Plaintiff Organization.

Jews for Jesus v. Brodsky, 993 F.Supp. 282, 311-13 (D. N.J. 1998) (citations omitted). A similar potential for damage exists here. A remedy at law alone would not help to protect Gallo's reputation, if Spider Webs can continue to use Gallo's trademarked name. Therefore, we find that it was not an abuse of discretion to enter an injunction in this case.

However, Spider Webs argues that the injunction issued by the trial court is overbroad. The only case to which Spider Webs points is Bally Total Fitness Corp. v. Faber, 29 F.Supp.2d 1161

15

(C.D. Cal. 1998). In that case, the defendant Faber had registered the domain name "www.compupix.com" and posted a web page at this address. This web page contained links to a number of other internal web pages created by Faber, including "www.compupix.com/ballysucks," which was dedicated to complaints about Bally's health club business. This linked web page contained an image of the Bally trademark with the word "sucks" printed across it. Id. at 1162. Although the court found that Faber had not infringed or diluted Bally's mark, it expressly distinguished the case before it from cases in which the defendant used the plaintiff's registered mark in the defendant's actual internet domain name, which could constitute infringement or dilution. Id. at 1165. However, the court stated in dicta that "even if Faber did use the mark as part of a larger domain name, such as 'ballysucks.com,' this would not necessarily be a violation as a matter of law." Id. The court distinguished this hypothetical from "cases like Panavision[, 141 F.3d at 1324] where an individual appropriates another's registered trademark as its domain name. In the 'cybersquatter' cases like Panavision, there is a high likelihood of consumer confusion--reasonably prudent consumers would believe that the site using the appropriated name is the trademark owner's official site. Here, however, no reasonably prudent Internet user would believe that 'Ballysucks.com' is the official site or is sponsored by Bally." Id. at 1165 n.2. This case therefore is unlike Bally, and Bally does not support Spider Webs's position.

In the case today, it was appropriate for the trial court to prevent Spider Webs from registering or using an internet domain name containing the words "Gallo" or "Ernest" and "Julio" in combination, and we affirm the trial court's injunction as issued. However, it is conceivable that the defendants could have a legitimate use for an internet domain name containing these words. If the defendants have such a specific, legitimate need in mind, they may return to the trial court and ask

16

for a modification of the injunction to allow for that need.

VII

For the reasons set forth above, the trial court correctly entered an injunction under the Texas ADS, ordered Spider Webs to transfer the domain name to Gallo under the ACPA, and awarded Gallo statutory damages under the ACPA, as well as post-judgment interest and costs. Accordingly, the judgment of the district court is

AFFIRMED.