RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0071P (6th Cir.)
File Name: 04a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LUCAS NURSERY AND
LANDSCAPING, INC.,
    *Plaintiff-Appellant,*

    *v.*

MICHELLE GROSSE,
    *Defendant-Appellee.*

No. 02-1668

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-73291—Bernard A. Friedman, District Judge.

Argued: October 31, 2003

Decided and Filed: March 5, 2004

Before: BATCHELDER and COLE, Circuit Judges;
HOOD, District Judge.[*]

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## COUNSEL

**ARGUED:** Kevin L. Bennett, HEMMING, POLACZYK, CRONIN, SMITH & WITTHOFF, Plymouth, Michigan, for Appellant. Jeffrey D. Wilson, RAYMOND & PROKOP, Southfield, Michigan, for Appellee. **ON BRIEF:** Kevin L. Bennett, HEMMING, POLACZYK, CRONIN, SMITH & WITTHOFF, Plymouth, Michigan, for Appellant. Jeffrey D. Wilson, RAYMOND & PROKOP, Southfield, Michigan, for Appellee.

## OPINION

R. GUY COLE, JR., Circuit Judge. Plaintiff-Appellant Lucas Nursery and Landscaping, Inc. ("Lucas Nursery") appeals the district court's grant of summary judgment for Defendant-Appellee Michelle Grosse in this action alleging that Grosse violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A) (2000) ("the ACPA"), by registering the domain name "lucasnursery.com" and creating a web site on which she detailed her complaints against Lucas for its allegedly bad service in landscaping her front yard. The central issue on appeal is whether the district court erred in granting summary judgment in favor of Grosse based upon its conclusion that the she did not act in bad faith within the meaning of the ACPA. For the reasons that follow, we **AFFIRM** the judgment of the district court.

### I. BACKGROUND

This case arises from a dispute related to landscaping work that was performed by Lucas Nursery at the residence of Michelle Grosse. In March 2000, Grosse hired Lucas

Nursery to correct a dip in the soil (known as a swale) that ran horizontally through the center of her front yard. Lucas Nursery's representative, Bob Lucas, Jr., stated that the swale could be corrected by using five large loads of topsoil. Lucas Nursery performed the work on May 16, 2000.

Grosse contends that the work was performed inadequately. After allegedly contacting Lucas Nursery on numerous occasions to express her displeasure with the work and to seek some repair, Grosse filed a complaint with the Better Business Bureau ("the BBB"). After the BBB ended its investigation without making a recommendation, Grosse remained dissatisfied by what she felt had been poor service by Lucas Nursery, and decided to inform others about her experience with the company.

On August 12, 2000, Grosse registered the domain name "lucasnursery.com." She then posted a web page for the sole purpose of relaying her story to the public. The web page was titled, "My Lucas Landscaping Experience." The web page included complaints regarding the poor preparation of the soil prior to Lucas Nursery's laying of the sod, the hasty nature of Lucas Nursery's work, the ineffectiveness of the BBB in addressing her complaint, and the fact that she had to pay an additional $5,400 to a second contractor to repair the work originally performed by Lucas Nursery.

On September 27, 2000, Grosse received a letter from Lucas Nursery's attorney demanding that she cease operating the web site. On October 2, 2000, Grosse removed the web site's content. However, after removing the web site's content, Grosse contacted the Michigan Bureau of Commercial Services Licensing Division and the U.S. Patent & Trademark Office to determine whether there was a registered trademark for Lucas Nursery. After learning that no trademark registration existed, Grosse concluded that Lucas Nursery could not prevent her from retaining the web site. On April 13, 2001, Grosse posted a new narrative

on the web site, again describing her experience with Lucas Nursery.

Lucas Nursery filed suit against Grosse on August 17, 2001. Thereafter, each party moved for summary judgment. On April 23, 2002, the district court denied Lucas Nursery's motion for summary judgment and granted Grosse's motion for summary judgment.

## II. ANALYSIS

### A. Standard of Review

We review a district court's decision to grant summary judgment *de novo. Stephenson v. AllState Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing a motion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, a "mere scintilla" of evidence is insufficient; the evidence must be such that a reasonable jury could find in favor of the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. The ACPA

"The ACPA was enacted in 1999 in response to concerns over the proliferation of cybersquatting – the Internet version of a land grab." *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 267 (4th Cir. 2001). It was enacted because then-existing law did not expressly prohibit the practice of cybersquatting, and cybersquatters had begun

to insulate themselves from liability under the Federal Trademark Dilution Act, 15 U.S.C. § 1125. *Id.*

In the Senate Report accompanying the ACPA, cybersquatters are defined as those who: (1) "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks;" (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder;" (3) "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site;" (4) "target distinctive marks to defraud consumers, including to engage in counterfeiting activities." S. REP. NO. 106-140 at 5-6.

Pursuant to the ACPA, a cybersquatter is potentially liable to the owner of a protected mark if that person:

(i) has a bad faith intent to profit from the mark . . . ; and
(ii) registers, traffics in, or uses a domain name that --
(I) in the case of a mark that is distinctive . . . , is identical or confusingly similar to that mark;
(II) in the case of a famous mark . . . , is identical or confusingly similar to or dilutive of that mark; or
(III) is a trademark, word, or name protected by reason of section 706 of Title18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

### 1. Non-Commercial Activity and the ACPA

Although there is some dispute between the parties as to whether the ACPA covers non-commercial activity, we see no reason to consider these arguments, as the statute directs a reviewing court to consider only a defendant's "bad faith intent to profit" from the use of a mark held by another party. We, therefore, turn to this consideration.

### 2. Bad Faith Analysis

In order for liability to attach under the ACPA a court must conclude that the defendant's actions constitute "bad faith." ACPA § 3002 (codified at 15 U.S.C. § 1125(d)(1)(A)-(B)). An analysis of whether a defendant's actions constitute bad faith within the meaning of the ACPA usually begins with consideration of several factors, nine of which are listed in the ACPA. *See Sporty's Farm v. Sportman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2000). The first four factors are those that militate against a finding of bad faith by providing some reasonable basis for why a defendant might have registered the domain name of another mark holder. These factors focus on: whether the defendant has trademark or other rights in the domain name; the extent to which the domain name consists of the defendant's legal name or other common name; any prior use of the domain name for the offering of goods and services; and the bona fide noncommercial use of the site.

Each of the first three factors cuts against Grosse. She does not hold a trademark or other intellectual property rights to the domain name or names included in the registered domain name. The domain name neither consists of her legal name or any name used to refer to her. Grosse has also not used the domain name in connection with any offering of goods or services. The fourth factor cuts in Grosse's favor because the site was used for noncommercial purposes.

Factors five through eight are indicative of the presence of bad faith on the part of the defendant. These factors focus on: whether the defendant seeks to divert consumers from the mark holder's online location either in a way that could harm good will or tarnish or disparage the mark by creating a confusion regarding the sponsorship of the site; whether there has been an offer to transfer or sell the site for financial gain; whether the defendant provided misleading contact information when registering the domain name; and whether

the defendant has acquired multiple domain names which may be duplicative of the marks of others.

The paradigmatic harm that the ACPA was enacted to eradicate – the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark – is simply not present in any of Grosse's actions. In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an "intent to trade on the goodwill of another's mark." S. REP. NO. 106-140, at 9. *See also Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA."). There is no evidence that this was Grosse's intention when she registered the Lucas Nursery domain name and created her web site. It would therefore stretch the ACPA beyond the letter of the law and Congress's intention to declare anything to the contrary.

None of these factors militates against Grosse. There is no dispute that Lucas Nursery did not have an online location, and hence Grosse's creation of a web site to complain about Lucas Nursery's services could not have been intended "to divert consumers from the mark owners's online location." Nor is there any evidence that Grosse ever sought to mislead consumers with regard to the site's sponsorship. The web site explicitly stated that the site was established by Grosse for the purposes of relaying her experience with Lucas Nursery. Moreover, Grosse never offered to sell the site to Lucas Nursery. She also did not provide misleading contact information when she registered the domain name. Finally, she has not acquired any additional domain names, which would be indicative of either an intent to sell such names to those entities whose trademarks were identical or similar, or exploit them for other uses.

Lucas Nusery contends that the Fourth Circuit's decision in *People for the Ethical Treatment of Animals (PETA) v. Doughney*, 263 F.3d 359 (4th Cir. 2001), is applicable to the instant action. Although the defendant in *Doughney* did not make commercial use of his web site, the court concluded that he had, nonetheless, acted with a bad faith intent to profit. Doughney had "made statements on his website and in the press recommending that PETA attempt to 'settle' with him and 'make him an offer'" and that he had "registered other domain names that [were] identical or similar to the marks or names of other famous people and organizations." *Id.* at 369. Here, Grosse has engaged in no such offensive conduct.

Lucas Nursery seeks to buttress its argument with *Toronto-Dominion Bank v. Karpachev*, 188 F. Supp. 2d 110 (D. Mass. 2002). There, the district court granted Toronto-Dominion's motion for summary judgment against the defendant, concluding that there was sufficient evidence to show that the defendant had acted in bad faith under the ACPA. The defendant, a disgruntled customer, registered sixteen domain names composed of various misspellings of the name tdwaterhouse.com. *Id.* at 111. On the web sites associated with these names, the defendant attacked Toronto-Dominion for "webfacism" and involvement with white collar crime, among other things. *Id.* at 112. The court concluded that the defendant had acted in bad faith, citing four factors: (1) his intention to divert customers from the "tdwaterhouse" web site by creating confusion as to its source or sponsorship; (2) the fact that he had registered sixteen domain names; (3) the fact that he offered no goods or services on the site; and (4) the fact that he had no intellectual property rights in the site. *See id.* at 114.

Although Grosse's actions would arguably satisfy three of the four aforementioned factors, she does not fall within the factor that we consider central to a finding of bad faith. She did not register multiple web sites; she only registered one. Further, it is not clear to this Court that the presence of simply

one factor that indicates a bad faith intent to profit, without more, can satisfy an imposition of liability within the meaning of the ACPA. The role of the reviewing court is not simply to add factors and place them in particular categories, without making some sense of what motivates the conduct at issue. The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit. Perhaps most important to our conclusion are, Grosse's actions, which seem to have been undertaken in the spirit of informing fellow consumers about the practices of a landscaping company that she believed had performed inferior work on her yard. One of the ACPA's main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands. The practice of informing fellow consumers of one's experience with a particular service provider is surely not inconsistent with this ideal.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of Grosse.