United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 21, 2004**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 03-20243
No. 03-20291
_____

TMI INC,

Plaintiff-Appellee

v.

JOSEPH M. MAXWELL,

Defendant-Appellant

--------------------
Appeals from the United States District Court
for the Southern District of Texas
--------------------

Before DAVIS, BARKSDALE and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Following a bench trial, the district court determined that Appellant Joseph Maxwell's website that complained about Appellee TMI, Inc. violated the anti-dilution provision of the Lanham Act, 15 U.S.C. § 1125(c); the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); and the Texas Anti-Dilution Statute, TEX. BUS. & COM. CODE § 16.29. Concluding that Maxwell's site, as a non-commercial gripe site, violates none of these statutes, we reverse and render judgment in favor of Maxwell.

Appellant Joseph Maxwell intended to buy a house from Appellee TMI, Inc., a company that builds houses under the name TrendMaker Homes. Unhappy with what he viewed as the

1

salesperson's misrepresentations about the availability of a certain model, Maxwell decided to create a website to tell his story. To this end, Maxwell registered an internet domain name – www.trendmakerhome.com – that resembled TMI's TrendMaker Homes mark. (TMI had already been using the domain name www.trendmakerhomes.com.) Maxwell registered his domain name for a year; after the year passed, Maxwell removed the site and let the registration expire.

During its existence, the site contained Maxwell's story of his dispute with TMI, along with a disclaimer at the top of the home page indicating that it was not TMI's site. It also contained what Maxwell called the Treasure Chest. Maxwell envisioned the Treasure Chest as a place for readers to share and obtain information about contractors and tradespeople who had done good work. During the year of the site's existence, the Treasure Chest only contained one name, that of a man who had performed some work for Maxwell. The site did not contain any paid advertisements.

The parties agree that some e-mail intended for TMI was sent to Maxwell's site. They also agree that Maxwell forwarded each of these messages to TMI.

Shortly after Maxwell's registration expired, TMI sent Maxwell a letter demanding that he take down the site and relinquish the www.trendmakerhome.com domain name. In response, Maxwell attempted to re-register the domain name. His attempt

2

was unsuccessful, however, because TMI had acquired the domain name once Maxwell's registration expired. Instead, Maxwell registered the domain name www.trendmakerhome.info. This lawsuit followed. Because of the suit, Maxwell has never posted any content on the trendmakerhome.info site.

Almost immediately, the parties entered into settlement negotiations. Maxwell retained a lawyer, but knew he would not be able to afford to pay the legal fees that would be required to defend the entire lawsuit. TMI and Maxwell's lawyer negotiated a settlement, while Maxwell researched his case. Following this research, Maxwell backed out of the settlement agreement and proceeded pro se. He continued to represent himself through the bench trial on January 17, 2003.

After the trial, the district court issued a Memorandum and Order. In it, the district court found that Maxwell violated the ACPA as well as the federal and Texas anti-dilution statutes. The district court also issued an injunction forbidding Maxwell "from using names, marks, and domain names similar to" ten of TMI's marks, including Trend Maker, and ordering Maxwell to transfer trendmakerhome.info to TMI. The district court also required TMI to submit a proposed judgment and gave Maxwell ten days to respond to that proposal. Maxwell immediately filed a notice of appeal.

Without allowing Maxwell ten days to respond, the district court signed TMI's proposed judgment. In many ways, this

judgment expanded the Memorandum and Order's conclusions.  For example, the Memorandum and Order contained no findings about either common law or statutory unfair competition.  Yet the judgment stated that Maxwell's actions constituted unfair competition under both common law and the Lanham Act.  The judgment provided a broader injunction than the one contained in the district court's original order by adding three marks to the injunction.  The judgment also awarded statutory damages of $40,000 and, without elaboration, found the case to be an "exceptional case," justifying an award of $40,000 in attorney's fees.  Additionally, the judgment addressed how Maxwell was to pay the judgment: "[w]ithin twenty (20) days after entry of this Order, defendant shall hand-deliver to plaintiff's lawyer a cashier's check in the amount of $80,000, made payable to TMI, Inc."  Maxwell then filed his second notice of appeal.

TMI made several related claims in this lawsuit.  In the first, TMI alleged that Maxwell violated ACPA.  Additionally, TMI alleged that Maxwell's actions diluted its mark and thus violated the Texas Anti-Dilution Statute, as well as the anti-dilution provision of the Lanham Act.[1]

Commercial Use Requirement

---

[1]TMI also alleged unfair competition under the Lanham Act and under the common law.  The district court made no findings on unfair competition, until those claims were added to the judgment, and TMI makes no arguments in support of its judgment on those claims on appeal.

We first address whether the two relevant sections of the Lanham Act – the anti-dilution provision and ACPA – require commercial use for liability.[2]  The district court concluded that ACPA requires commercial use, but did not address commercial use in the context of the anti-dilution provision.  TMI argues that the anti-dilution provision applies even in the absence of commercial use.

In making this argument, TMI does not address the anti-dilution provision's language, which conditions liability on commercial use:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's <u>commercial use in commerce</u> of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.
> 15 U.S.C. § 1125(c)(1)(emphasis added).

Citing this language, courts have observed that the anti-dilution provision requires the diluter to have made commercial use of the mark.[3]  <u>See, e.g</u>, <u>Bird v. Parsons</u>, 289 F.3d 865, 879

---

[2]This Court has previously determined that § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), which addresses false and misleading descriptions, only applies to commercial speech.  <u>See</u> <u>Procter & Gamble Co. v. Amway Corp.</u>, 242 F.3d 539, 547 (5th Cir. 2001).

[3]TMI refers to <u>United We Stand America, Inc. v. United We Stand, America New York, Inc.</u>, 128 F.3d 86, 89-90 (2d Cir. 1997), for the principle that the Lanham Act does not require commercial use. <u>United We Stand America</u> does not involve either the anti-dilution provision or ACPA and is, thus, irrelevant to the determination of whether these two sections require commercial

5

(6th Cir. 2002); <u>Panavision Int'l, L.P. v. Toeppen</u>, 141 F.3d 1316, 1324 (9th Cir. 1998).  One of the exceptions to the anti-dilution provision further indicates that the provision only applies to commercial use: "(4) The following shall not be actionable under this section . . . (B) Noncommercial use of a mark."  15 U.S.C. § 1125(c)(4).  We conclude that, under the statute's language, Maxwell's use must be commercial to fall under the anti-dilution provision.

On the other hand, ACPA's language does not contain such a specific commercial-use requirement.  Under ACPA, the owner of a mark can recover against a person who, acting with "a bad faith intent to profit from that mark . . . registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d).  ACPA thus bases liability on a bad faith intent to profit.  ACPA lists nine non-exclusive factors for courts to consider when determining whether a defendant had a bad faith intent to profit.  One of those factors is "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name." 15 U.S.C. § 1125(d)(IV).

This Court has addressed ACPA and commercial use in <u>E. & J. Gallo Winery v. Spider Webs Ltd.</u>, 286 F.3d 270, 276 n.3 (5th Cir. 2002). In <u>Gallo</u>, the defendant Spider Webs registered domain

---

use.

names that "could be associated with existing businesses, including 'ernestandjuliogallo.com,' 'firestonetires.com,' 'bridgestonetires.com,' 'bluecross-blueshield.com,' 'oreocookies.com,' 'avoncosmetics.com,' and others." 286 F.3d at 272. Spider Webs then auctioned those domain names, refusing all bids of less than $10,000. Id. One of Spider Webs' owners testified during deposition that, after registering the domain name ernestandjuliogallo.com, Spider Webs hoped that Gallo would contact it so that Spider Webs could "assist" the company. Id. With this evidence, the Court determined that the defendant's use was commercial; the company registered domain names and then sold those names to trademark holders. Id. at 275. Because Spider Web's use was so clearly commercial, the Court noted that it did not need to decide whether ACPA also requires use in commerce. Id. at 276 n.3. The Sixth Circuit, too, recently determined that it did not need to consider arguments about whether ACPA covers non-commercial use, "as the statute directs a reviewing court to consider only a defendant's 'bad faith intent to profit' from the use of a mark held by another party. Lucas Nursery & Landscaping, Inc. v. Grosse, 359 F.3d 806, 809 (6th Cir. 2004). Like the Lucas Nursery court, we, too, do not need to decide this question in this case.

Was Maxwell's site commercial use?

TMI argues that Maxwell's site was "mixed-use" and therefore

7

not protected from the Lanham Act's coverage.  According to TMI, Maxwell put the site to commercial use by including the Treasure Chest and in so doing removed any protections his speech might otherwise have had.

The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. When defining commercial use, courts have examined several different aspects of the defendant's use.  The Ninth Circuit has emphasized that commercial use in commerce "refers to a use of a famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner." Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 903 (9th Cir. 2002) and that the phrase "requires the defendant to be using the trademark as a trademark, capitalizing on its trademark status." Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 880 (9th Cir. 1999). Put another way, the Ninth Circuit in Avery Dennison also referred to "a classic 'cybersquatter' case" in which a court referred to the "'intention to arbitrage' the registration which included the plaintiff's trademark." Id. (quoting Intermatic, Inc. v. Toeppen,  947 F.Supp. 1227, 1239 (N.D. Ill. 1996).  This Court has provided a similar definition, determining in Gallo that the defendant's business of selling domain names containing marks satisfied the commercial use requirement.  Gallo, 286 F.3d at 275.  See also Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1325 (9th Cir. 1998) ("[defendant's] 'business' is to register

8

trademarks as domain names and then sell them to the rightful trademark owners"). Other courts have emphasized the content of the website. For example, while analyzing another section of the Lanham Act, the Sixth Circuit concluded that so long as the defendant's fan website contained no links to commercial sites, and contained no advertising or other specifically commercial content, his site was not commercial. <u>Taubman Co. v. Webfeats</u>, 319 F.3d 770, 775 (6th Cir. 2003).

TMI agrees that the section of the site addressing Maxwell's complaints about TMI was noncommercial. TMI argues, however, that the Treasure Chest section was commercial, and thus the site "intermingle[d] gripes with commercial activities."

Admittedly, Maxwell added the Treasure Chest to draw more people to his site so that they would see his story. This intent does not make his site commercial, however. Maxwell never accepted payment for a listing on the Treasure Chest, and he charged no money for viewing it.[4] Further, TMI presented no evidence that Maxwell had any intent to ever charge money for using the site. Additionally, Maxwell's site contained neither advertising nor links to other sites. And unlike the defendants in <u>Gallo</u>, Maxwell was not engaged in the business of selling domain names. <u>Gallo</u>, 286 F.3d at 275; <u>see also Panavision Int'l,</u>

---

[4]In fact, the Treasure Chest only ever contained one listing, for a contractor who had done some work for Maxwell. This listing was not made at the contractor's request.

9

L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998) ("Toeppen's commercial use was his attempt to sell the trademarks themselves").  Nor did TMI present evidence that Maxwell's use was "in the ordinary course of trade," or that it had any business purpose at all.  Thus, no evidence suggests that Maxwell's use was commercial, and the district court's findings to the contrary were clear error.[5]

Bad faith intent to profit

ACPA lists nine non-exclusive factors for courts to consider when determining whether a defendant had a bad faith intent to profit from use of the mark.[6]  These factors are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;
(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark

---

[5] The district court's discussion of commercial use (under ACPA) was: "[b]ased on the undisputed evidence, the Court holds that the defendant's actions have been intentional, flagrant, and in bad faith.  Moreover, he has shown no remorse for his actions, even in trial.  Thus, the defendant's use of "trendmakerhome.com" was the kind of commercial use prohibited by the ACPA."

[6] ACPA's safe harbor provision also provides that "[b]ad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous . . .

15 U.S.C. § 1125(d)(1)(B)(i).

Much of the district court's analysis of bad faith intent to profit focuses on Maxwell's behavior during the settlement negotiations and, particularly, his backing out of the settlement. Although the district court listed the nine relevant factors, in the Memorandum and Order it did not explain how those factors apply to this case.

Maxwell's behavior differs from other registrations made with bad faith intent to profit. For example, in Gallo, and other cases, the defendant essentially held hostage a domain name

11

that resembled a mark with the intention of selling it back to the mark's owner. So, too, is Maxwell's use different from that of the defendant in <u>Virtual Works, Inc. v. Volkswagen of America, Inc.</u>, 238 F.3d 264 (4th Cir. 2001), where Virtual Works registered the domain name "VW.net" for its own website, but also hoping to sell the name to Volkswagen, whose VW mark the domain name resembled.[7]

In contrast to these instances of bad faith intent to profit, the Sixth Circuit recently affirmed a trial court's finding that a disgruntled customer who posted a website similar to Maxwell's did not have a bad faith intent to profit. <u>Lucas Nursery & Landscaping, Inc. v. Grosse</u>, 359 F.3d at 811. In <u>Lucas Nursery</u>, a former customer of Lucas Nursery registered the domain name "lucasnursery.com" and used the site to post her complaints about the nursery's work. <u>Id</u>. at 808. The nursery sued her under ACPA. <u>Id</u>. After addressing the purposes behind ACPA,[8] the

---

[7]In fact, at one point, Virtual Works threatened to auction the domain name to the highest bidder unless Volkswagen paid them for it. <u>Id</u>. at 267.

[8]The <u>Lucas Nursery</u> court concisely summarized the Senate Report's description of cybersquatters, namely those who:
(1) "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks;" (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder;" (3) "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site;" (4) "target distinctive marks to defraud consumers, including to engage in counterfeiting activities."

12

Lucas Nursery court concluded that the former customer did not have the kind of intent to profit that the act was designed to prohibit. Id. at 808-11.

As in Lucas Nursery, here "[t]he paradigmatic harm that the ACPA was enacted to eradicate - the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark - is simply not present." Id. at 810. Also here, as in Lucas Nursery, the site's purpose as a method to inform potential customers about a negative experience with the company is key. As the Sixth Circuit noted:

> Perhaps most important to our conclusion are, [defendant's] actions, which seem to have been undertaken in the spirit of informing fellow consumers about the practices of a landscaping company that she believed had performed inferior work on her yard. One of the ACPA's main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands. The practice of informing fellow consumers of one's experience with a particular service provider is surely not inconsistent with this ideal. Id. at 811.

In short, after analyzing the statutory factors and ACPA's purpose, we are convinced that TMI failed to establish that Maxwell had a bad faith intent to profit from TMI's mark and that the district court's conclusion to the contrary was clearly erroneous. Although factors I, II, III and IX seem to fall in favor of TMI because Maxwell had no pre-existing use of the

---

Lucas Nursery, 359 F.3d at 809 (*quoting* S.Rep. No. 106-140 at 5-6).

TrendMaker name and Maxwell did not dispute that the mark was distinctive and famous, importantly, factors IV, V, VI, VII, and VIII favor Maxwell. Under factor IV, Maxwell made bona fide noncommercial use of the mark in his site, and for purposes of factor V, TMI made no showing that Maxwell intended to divert customers from its own site. Turning to factor VI, Maxwell never offered to sell the domain name, and certainly never had a pattern of selling domain names to mark owners. Maxwell did not behave improperly when providing contact information, as addressed in factor VII. Factor VIII concerns the registration of multiple domain names; Maxwell's registration of his second site related to TrendMaker Homes does not argue in favor of finding bad faith intent to profit. Maxwell registered the second domain name for the same purposes as the first one and only after his registration of the first name expired. Finally, like the Lucas Nursery court, we particularly note that Maxwell's conduct is not the kind of harm that ACPA was designed to prevent.

Texas Anti-Dilution Statute

The district court also found that Maxwell violated the Texas Anti-Dilution Statute.

That statute reads:

> A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the

14

parties or confusion as to the source of goods or services.
TEX. BUS. & COM. CODE § 16.29.

This statute "is not intended to address non-trademark uses of a name to comment on, criticize, ridicule, parody, or disparage the goods or business of the name's owner." <u>Express One Int'l, Inc. v. Steinbeck</u>, 53 S.W.3d 895, 899 (Tex. App. – Dallas 2001, no pet.)(citing McCarthy). Because this exception describes Maxwell's use, Maxwell's domain name is not actionable under the Texas Anti-Dilution Statute.

<u>Conclusion</u>

For these reasons, we reverse the judgment of the district court and render judgment in favor of Maxwell.

REVERSED AND RENDERED.

15