**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 8, 2009

Charles R. Fulbruge III
Clerk

No. 07-11223

LAWRENCE PATRICK DAVIS

Plaintiff-Appellant

v.

TARRANT COUNTY TEXAS; SHAREN WILSON, Honorable, in
Individual and Official Capacity; WAYNE SALVANT, Honorable,
in Individual and Official Capacity; ELIZABETH BERRY, Honorable,
in Individual and Official Capacity; MIKE THOMAS, Honorable,
in Individual and Official Capacity; MOLLEE WESTFALL,
Honorable, in Individual and Official Capacity; EVERETT YOUNG,
Honorable, in Individual and Official Capacity; SCOTT WISCH,
Honorable, in Individual and Official Capacity; GEORGE
GALLAGHER, Honorable, in Individual and Official Capacity;
ROBERT K GILL, Honorable, in Individual and Official Capacity;
JAMES WILSON, Honorable, in Individual and Official Capacity;
JEFF WALKER, Honorable, in Individual and Official Capacity

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before BENAVIDES, SOUTHWICK, and HAYNES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Appellant Lawrence Patrick Davis, a criminal defense attorney who
practices primarily in Tarrant County, Texas, filed this suit because the Tarrant
County criminal district judges denied his application to be included on the list

of attorneys eligible for court appointment in felony cases in Tarrant County, known as "the wheel." Davis sued the district judges hearing felony cases in Tarrant County and the presiding judge of the Eighth Judicial Administrative Region (collectively, the "defendant judges") in both their individual and official capacities, and Tarrant County, under 42 U.S.C. § 1983, asserting that the establishment and implementation of the county policy for the appointment of counsel to represent indigent defendants and the denial of his application violated the due process and equal protection clauses of the Fourteenth Amendment and the due process clause of the Fifth Amendment.

The district court granted the motions to dismiss filed by the defendant judges and Tarrant County on the grounds: (1) that the defendant judges were immune from suit in their individual capacities because they were acting in their judicial capacities when they established and implemented the appointment policy and denied Davis's application; (2) that the defendant judges were immune from suit in their official capacities under the Eleventh Amendment; and (3) that Tarrant County was not liable as a matter of law because the defendant judges were acting on behalf of the state of Texas, not Tarrant County. The district court did not address the alternative grounds for dismissal raised in the motions to dismiss, including that Davis had failed to allege any violation of a protected property right or liberty interest and that the defendant judges were entitled to qualified and legislative immunity.

Davis appealed, arguing: (1) that the defendant judges' acts were not judicial in nature; (2) that the Eleventh Amendment did not bar his request for prospective declaratory relief; and (3) that Tarrant County was liable for the defendant judges' actions because the Texas Fair Defense Act, passed in 2001, makes the defendant judges county policymakers. An amicus brief was submitted by the Texas Fair Defense Project ("TFDP") in support of Davis's position that the defendant judges acted as county policymakers and that

Tarrant County may be held liable for the defendant judges' actions in establishing and implementing the appointment policy.

For the reasons stated below, we AFFIRM.

## I.      Standard of Review

A district court's grant of a motion to dismiss is reviewed de novo, using the same standard as the district court. *See Frank v. Delta Airlines, Inc.*, 314 F.3d 195, 197 (5th Cir. 2002). In ruling on a motion to dismiss, a court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted).

## II.     Background

### A.      Davis's Application for Felony Court Appointments

On June 1, 2005, Davis submitted an application to be included on the Tarrant County felony court appointment wheel. His application was denied on August 1, 2005. On October 28, 2005, Davis's attorney sent a letter to the Tarrant County criminal district judges asking for an explanation of the denial and requesting a hearing. The judges did not respond to the letter. On June 2, 2006, Davis sent another letter to the judges asking for an explanation of the denial of his application and requesting a hearing. The judges did not respond to the second letter.

Davis alleges that the judges denied his application to be included on the felony court appointment wheel because he did not have good personal relationships with the judges, he was not part of the judges' "good ol' boys" network, and the judges were trying to exclude qualified attorneys from the wheel in order to increase the conviction rate and clear the criminal court's docket.

**B.    The Texas Fair Defense Act**

In 2001, the Texas Fair Defense Act (the "Act") was passed.  The Act substantially revised Article 26.04 of the Texas Code of Criminal Procedure, which governs the procedures for the appointment of counsel.  Prior to January 1, 2002, when the Act went into effect, Article 26.04 provided that decisions regarding the appointment of counsel would be made by individual judges on a case-by-case basis.  Article 26.04 stated:

Court shall appoint counsel

> (a) Whenever the court determines that a defendant charged with a felony or a misdemeanor punishable by imprisonment is indigent or that the interests of justice require representation of a defendant in a criminal proceeding, the court shall appoint one or more practicing attorneys to defend him. . . .

Tex. Code Crim. Pro. Ann. art. 26.04 (Vernon 1989).

The 2001 amendment established a much more detailed procedural regime for the appointment of counsel in criminal cases that requires judges in each county to establish standardized countywide procedures.  The 2001 amendment provides that the countywide policy may be based on the establishment of a public appointment list, the appointment of a public defender, the creation of an "alternate program," or simply allowing judges to appoint attorneys from any county in the court's administrative judicial region.  The text of Article 26.04 following the 2001 amendment provides in relevant part:

Procedures for Appointing Counsel

(a) The judges of the county courts, statutory county courts, and district courts trying criminal cases in each county, by local rule, shall adopt and publish written countywide procedures for timely and fairly appointing counsel for an indigent defendant in the county arrested for or charged with a misdemeanor punishable by confinement or a felony. . . .  A court shall appoint an attorney from a public appointment list using a system of rotation, unless the court appoints an attorney under [those subsections addressing the appointment of the public defender, the creation of a countywide

4

alternative program, or a judge's ability to appoint a counsel from any county in the court's administrative judicial region]. The court shall appoint attorneys from among the next five names on the appointment list in the order in which the attorneys' names appear on the list, unless the court makes a finding of good cause on the record for appointing an attorney out of order. An attorney who is not appointed in the order in which the attorney's name appears on the list shall remain next in order on the list.

Tex. Code Crim. Pro. Ann. art. 26.04 (Vernon 2009). Article 26.04 sets out a number of requirements for the countywide procedures, such as that they authorize only the judges of the county courts, statutory county courts, and district courts trying criminal cases in the county, or the judges' designee, to appoint counsel for indigent defendants in the county; that they ensure that appointments are allocated among qualified attorneys in a manner that is fair, neutral, and nondiscriminatory; and that the judges specify the objective qualifications necessary for an attorney to be included on the public appointment list. *Id.*

## C.    The Tarrant County Appointment Policies

In order to comply with the Texas Fair Defense Act, the judges of the Tarrant County criminal district courts published a set of guidelines for felony court appointments. The guidelines in effect at the time Davis applied for felony court appointments in Tarrant County in June 2005 stated that appointments were to be made from a rotating list of the names of eligible attorneys, arranged according to the chronological date of receipt of an approved application, and that an attorney was to receive one defendant per rotation on the appointment list. The guidelines set out mandatory general qualifications for attorneys who sought criminal court appointments. These qualifications appear to be mostly

objective, e.g., being a member in good standing of the state bar who maintains a principal office in Tarrant County.[1]

On April 24, 2006, the Tarrant County criminal district court judges issued the Tarrant County District Courts Felony Court-Appointment Plan (the "Plan"), which superseded the existing guidelines for felony court appointments. The Plan was signed by Judges Sharen Wilson, Wayne Salvant, Elizabeth Berry, Mike Thomas, Bob Gill, Everett Young, James Wilson, Scott Wisch, and George Gallagher, and was approved by Jeff Walker, the Presiding Judge of the Eighth Administrative Judicial Region. The Plan provides that a qualified attorney will be appointed to each indigent defendant based on a rotating felony appointment wheel consisting of the names of qualified attorneys approved by a majority of the district judges hearing criminal cases, and that each qualified attorney will be appointed to represent one indigent defendant per rotation through the wheel. The Plan allows judges or their designees to deviate from the rotation system and appoint an attorney who is specifically qualified under the Plan on an ad hoc basis upon a finding of good cause to deviate from the rotation system.

The Plan, like the superseded guidelines, imposes mandatory general qualifications for attorneys seeking appointments. The Plan states: "A critical review of the quality of representation actually provided by attorneys applying to be on the wheel is a factor in providing high quality representation to indigent

---

[1] The general qualifications also included having a functioning fax machine and email address and some means of regularly receiving phone messages, filing a sworn application for appointments approved by the district judges with the Coordinator of Attorney Appointments, notifying the Coordinator of any matter that would disqualify the attorney from receiving appointments and filing an annual compliance update, and appearing in cases to which the attorney has been appointed and representing indigent clients that the attorney has been appointed to represent. The guidelines also imposed minimum qualifications for appointments in specific categories of cases, such as "State Jail Felony" and "Second and Third Degree Felony and Motion to Revoke or Adjudicate Community Supervision." These qualifications related to the number of cases in the relevant category that the attorney had been involved with, the number of years the attorney had been licensed to practice, and the attorney's board certifications and CLE training.

defendants. In addition to the objective criteria outlined herein, the statutes of the State of Texas provide for a subjective review of the qualifications of the attorneys applying for inclusion on the wheel. . . . The establishment of this system of qualifications confers to no attorney a property interest in receiving felony court-appointments." The specific qualifications required to receive appointments in certain categories of felony cases appear to be essentially identical to those in the superseded guidelines, but the Plan includes additional "objective" general qualifications to receive appointments, such as consistently demonstrating commitment to providing effective assistance of counsel and quality representation to criminal defendants; consistently demonstrating professionalism, proficiency, and reliability in representing criminal defendants and in dealing with the courts and opposing counsel; and being of sound mind, as well as good moral and ethical character.[2]

## III. Standing

Davis challenges both his rejection under the Tarrant County guidelines in effect at the time he applied for felony court appointments in June 2005 and the establishment and implementation of the 2006 Plan, which superseded the existing guidelines. The defendant judges contend that Davis lacks standing to bring a claim based on the adoption of the 2006 Plan because his application for inclusion on the Tarrant County felony court appointment wheel was submitted and denied under the superseded guidelines before the Plan was adopted in 2006, and he has failed to file another application.

---

[2] The additional "objective" qualifications also include: being familiar with Texas law; not having been sanctioned by a court for failure to appear or for any type of unprofessional or abusive conduct; maintaining a listing in the telephone directory; promptly responding to communications from the court; maintaining the capacity to access the court's electronic filing system; and promptly contacting individuals who the attorney has been appointed to represent.

The district court did not base its ruling on Davis's lack of standing to challenge the adoption of the Plan, but standing is a jurisdictional requirement and may be raised at any time. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). In order to satisfy the standing requirement of an "actual or imminent" injury, a plaintiff generally must submit to the challenged policy before pursuing an action to dispute it. *See, e.g.*, *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–71 (1972) (holding that plaintiff who had never applied for membership lacked standing to challenge fraternal organization's discriminatory membership policies); *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 388 (5th Cir. 2003) (holding that plaintiff lacked standing to challenge waiver policy because he failed to apply for waiver services); *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1221 (9th Cir. 1992) ("[A] plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."). However, strict adherence to this general rule may be excused when a policy's flat prohibition would render submission futile. *LeClerc v. Webb*, 419 F.3d 405, 413 (5th Cir. 2005) (citing *Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998)).

Davis does not clearly articulate his response to the defendant judges' standing argument, but it appears that he speculates that his application would have been rejected if he had reapplied under the Plan due to his rejection under the superseded guidelines. Such speculation is not sufficient to show that applying under the Plan would have been futile. *See United Indus., Inc. v. Eimco Process Equip. Co.*, 61 F.3d 445, 449 (5th Cir. 1995) (holding that evidence of futility was insufficient because it amounted to nothing more than a pessimistic belief that it was not worth attempting to compete for a project); *Pucket v. Hot Springs School Dist. No. 23-2*, 526 F.3d 1151, 1162 (8th Cir. 2008) (holding that plaintiffs lacked standing because "there was no allegation or evidence that a request by the plaintiffs to reinstate busing of Bethesda students

after § 13-29-1.2 became effective would have been futile"); *cf. Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998) (holding that it would have been futile for plaintiffs to apply for permits because they had been sent a letter specifically stating that the permits would be denied); *Moore v. U.S. Dep't of Agric.*, 993 F.2d 1222, 1222–1224 (5th Cir. 1993) (holding that white farmers did not have to complete an application to participate in a Farmers Home Administration program when the FMHA told them that the program was closed to whites); *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) (holding that application for sign permits would be futile when city had sued plaintiffs to remove signs, and ordinance "flatly prohibited" the signs).

Davis has standing to challenge only his rejection under the Tarrant County guidelines in effect at the time he applied for felony court appointments in June 2005. He lacks standing to challenge the establishment and implementation of the 2006 Plan.

## IV. Claims Against the Defendant Judges in their Individual Capacities

### A. The Legal Standard for Judicial Immunity

A judge generally has absolute immunity from suits for damages. *Mireles v. Waco*, 502 U.S. 9, 9–10 (1991) (citations omitted). Judicial immunity is an immunity from suit, not just the ultimate assessment of damages. *Id.* at 11 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The Court described the purposes served by judicial immunity in *Forrester v. White*, 484 U.S. 219 (1988):

> [T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have. . . . If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication.

*Id.* at 226–27 (citation omitted).

There are only two circumstances under which judicial immunity may be overcome. "First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity." *Mireles*, 502 U.S. at 11 (citations omitted). "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* (citations omitted). Allegations of bad faith or malice are not sufficient to overcome judicial immunity. *Id.*

"When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court, the doctrine of absolute judicial immunity has not been particularly controversial," but "attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges" has proven to be a more difficult task. *Forrester*, 484 U.S. at 227. In determining whether a particular act performed by a judge is entitled to absolute immunity, a court must draw a "distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.*; *see also Huminski v. Corsones*, 396 F.3d 53, 75 (2d Cir. 2005) ("At the margins, it can be difficult to distinguish between those actions that are judicial, and which therefore receive immunity, and those that happen to have been performed by judges, but are administrative, legislative, or executive in nature." (citations omitted)). Although administrative decisions "may be essential to the very functioning of the courts," such decisions have not been regarded as judicial acts.[3]

---

[3] *See Forrester*, 484 U.S. at 229 (holding that a judge's demotion and discharge of a court employee were administrative acts not protected by judicial immunity); *In Ex parte Virginia*, 100 U.S. 339, 348 (1880) (holding that a judge's preparation of an annual list of individuals eligible to serve on grand juries was not a judicial act covered by judicial immunity); *Morrison v. Lipscomb*, 877 F.2d 463, 465–66 (6th Cir. 1989) (finding that a chief

"[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.,* whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity." *Mireles*, 502 U.S. at 12 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)) (internal quotation marks omitted). "[T]he relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.' In other words, [a court should] look to the particular act's relation to a general function normally performed by a judge . . . ." *Id.* at 13 (citation omitted). This circuit has adopted a four-factor test for determining whether a judge's actions were judicial in nature: (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a

judge's declaration of a moratorium on the issuance of writs of restitution was an administrative, not judicial, act, because the moratorium was a general order not connected to any particular litigation that did not alter the rights and liabilities of any parties and only instructed court personnel on how to process the petitions made to the court, and that immunity did not apply); *McMillan v. Svetanoff*, 793 F.2d 149, 155 (7th Cir. 1986) ("Hiring and firing of employees is typically an administrative task. . . . The decision to fire the plaintiff did not involve judicial discretion; in other words, the judge did not utilize his education, training, and experience in the law to decide whether or not to retain plaintiff. The administrative act of firing the plaintiff will not assist the judge in interpreting the law or exercising judicial discretion in the resolution of disputes."); *Goodwin v. Circuit Court*, 729 F.2d 541, 549 (8th Cir. 1984) (county judge's decision to transfer hearing officer not "official judicial act" but rather "administrative personnel decision"); *Lynch v. Johnson*, 420 F.2d 818, 820 (6th Cir. 1970) (holding that county judge was not performing a judicial act when, while serving ex officio as the presiding officer of a county "fiscal court," the judge forcibly removed and jailed a member of the fiscal court because it was not an "ordinary judicial tribunal" and instead could best be characterized as a body through which the "affairs of the county are managed" with powers that are "legislative and administrative" in nature); *Lewis v. Blackburn*, 555 F. Supp. 713, 723 (W.D.N.C. 1983) (holding that a judge's appointment of magistrates is a ministerial act), *rev'd on other grounds*, 759 F.2d 1171 (4th Cir. 1985); *see also Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731 (1980) (holding that the Supreme Court of Virginia was acting in a legislative, not a judicial, capacity when it issued a Bar Code governing the actions of attorneys, because "propounding the Code was not an act of adjudication but one of rulemaking"); *Richardson v. Koshiba*, 693 F.2d 911, 914 (9th Cir. 1982) (screening decisions by judicial selection panel comprised of judges involve "executive" acts).

case pending before the court; and (4) whether the acts arose directly out of a visit to the judge in his official capacity.[4] *Ballard v. Wall*, 413 F.3d 510, 515 (5th Cir. 2005) (citing *Malina v. Gonzales*, 994 F.2d 1121, 1125 (5th Cir. 1993)). These factors are broadly construed in favor of immunity. *Id.* (citing *Malina*, 994 F.2d at 1125).

## B.    Analysis

The district court found that the defendant judges' acts were judicial because the appointment of counsel is a judicial act. The appointment of counsel for indigent defendants in criminal cases is a normal judicial function. *See, e.g., Birch v. Mazander*, 678 F.2d 754, 756 (8th Cir. 1982) ("[T]he acts complained of consist of the acceptance of a plea and the appointment of counsel. Clearly, these are functions normally performed by a judge."); *Davis v. State of N.Y.*, No. 90 Civ. 6170 (MBM), 1991 WL 156351, at *2 (S.D.N.Y. Aug. 6, 1991) ("The appointment of counsel is a judicial act." (citations omitted)); *Edwards v. Hare*, 682 F. Supp. 1528, 1531–33 (D. Utah 1988) (refusing to distinguish between the clearly judicial act of determining that a particular defendant has the right to court-appointed counsel and the process of connecting an indigent criminal defendant with a court-appointed attorney—the "mechanics" of obtaining counsel); *Lewis v. County of Lehigh*, 516 F. Supp. 1369, 1370–71 (E.D. Pa. 1981) ("The judges' involvement . . . constitutes solely the exercise of their judicial functions—appointing attorneys to represent indigent defendants. . . .").

---

[4] Amicus argues that this court should apply the six-factor standard set out in *Cleavinger v. Saxner*, 474 U.S. 193, 201–02 (1985) (citing *Butz v. Economou*, 438 U.S. 478, 512 (1978)), for whether an actor's role is analogous to that of a judge. That test is used to determine whether a nonjudicial actor's conduct is entitled to quasi-judicial immunity. Although there are some obvious parallels between the inquiries into whether the acts of a judge and the acts of a public official who is not a judge are "judicial" in nature, these are distinct inquiries. *See, e.g., Mireles*, 502 U.S. at 11; *Forrester*, 484 U.S. at 227; *Ballard*, 413 F.3d at 515. Nonetheless, in light of the parallels between the underlying nature of the inquiries, the analysis in quasi-judicial immunity cases may prove persuasive in the traditional judicial immunity context, as discussed in greater detail below.

However, the alleged wrongful act in this case does not concern the appointment of counsel in a specific suit by the judge presiding over that suit, but rather the selection of applicants for inclusion on a rotating list of applicants eligible for court appointments pursuant to a countywide policy.

The advocates on both sides of this issue find some support for their positions in the case law. Several courts have specifically held that a judge's acts in creating and implementing a plan or policy for the appointment of counsel, and not simply the appointment of counsel in a particular case, are judicial in nature. In *Hawkins v. Walvoord*, 25 S.W.3d 882 (Tex. App. 2000), the court held that (1) judges' ratification of a plan that required attorneys to either accept court appointments to represent indigent criminal defendants or pay a yearly fee and (2) judges' appointment of an attorney under that plan, were judicial acts entitled to absolute judicial immunity. *Id.* at 891. Similarly, in *Roth v. King*, 449 F.3d 1272 (D.C. Cir. 2006), the D.C. Circuit held that judges acted in a judicial capacity in creating a family-court attorney panel system and selecting attorneys for inclusion on a panel. *Id.* at 1286–87. In *Roth*, the chief judge of the Superior Court of the District of Columbia issued an administrative order creating a committee to recommend panels of designated and approved attorneys to represent indigent parties. *Id.* at 1277. Prior to the creation of the committee, superior court judges appointed counsel from a list of volunteers who had not been subjected to any sort of screening process. *Id.* Based on applications submitted by attorneys and evaluations submitted by superior court judges, the committee issued a report that recommended a list of attorneys for inclusion on the panels. *Id.* at 1277–78. The chief judge issued an administrative order establishing the attorney panels in accordance with the committee's recommendations. *Id.* at 1278. The D.C. Circuit found that the creation of the panel system and the selection of attorneys for inclusion on the

panels were judicial, not administrative, acts, and were protected by judicial immunity. *Id.* at 1286–87.

In a recent unpublished opinion on judicial immunity, *Dunn v. Kennedy*, No. 07-50548, 2008 WL 162855 (5th Cir. Jan. 17, 2008), this court held that a judge's decision to remove an attorney from a court appointment list was a judicial act. *Id.* at *1. The *Dunn* court based its holding in part on the fact that "the governing Texas statute 'authorize[s] only the judges,' or the judges' designee, to appoint counsel for indigent defendants in the county and to adopt and publish written procedures for the timely and fair appointment of counsel," *id.* (quoting Tex. Code Crim. Pro. Ann. art. 26.04 (Vernon 2006)), and that "the appointment of counsel to represent indigent defendants is a function normally performed by a judge acting in his judicial capacity," *id.* (citing *Roth*, 449 F.3d at 1286–87; *Hawkins*, 25 S.W.3d at 891). The *Dunn* court also based its holding on the fact that there was no allegation that the judge made the decision to remove the attorney anywhere other than in the courthouse building, that the decision centered around a case pending in court inasmuch as the attorney's removal was based on his conduct stemming from his representation of indigent defendants before the court, and that the decision arose from a visit to the judge in her official capacity, as the attorney's practice before the court and submission of payment vouchers were all directed toward the judge in her official capacity. *Id.* (citing *Ballard*, 413 F.3d at 515–18).

There is also authority supporting the proposition that decisions regarding which attorneys to include on a court appointment list, as opposed to decisions regarding appointment in a particular case, are administrative, not judicial, in nature. In *Mitchell v. Fishbein*, 377 F.3d 157, 174 (2d Cir. 2004), the Second Circuit was confronted with the question of whether a state-court screening committee's decision to remove an attorney from a panel of attorneys certified to serve as court-appointed counsel for indigent defendants was entitled to

quasi-judicial absolute immunity. As the defendant judges point out, *Mitchell* concerned the issue of quasi-judicial absolute immunity—the doctrine under which a private actor may be afforded the absolute immunity ordinarily accorded judges acting within the scope of their jurisdiction if the private actor's role is functionally comparable to that of a judge or if the private actor's acts are integrally related to an ongoing judicial proceeding—not judicial immunity. However, because "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches," *Forrester*, 484 U.S. at 227, the *Mitchell* court's analysis of whether a nonjudicial actor's acts were judicial for the purpose of assessing quasi-judicial immunity cannot be said to be completely inapplicable to the immunity issue presented in the instant case, especially in light of the fact that *Mitchell* extensively cited judicial immunity cases in its analysis. In assessing whether the committee's decisions were integrally related to a judicial proceeding, the court drew heavily on several judicial immunity decisions:

> Functions that might be deemed integrally related to the judicial process when undertaken in the context of a particular case may be viewed as administrative when they are undertaken outside that context, and "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not . . . been regarded as judicial acts," *Forrester v. White*, 484 U.S. 219, 228, 108 S. Ct. 538, 98 L.Ed.2d 555 (1988). For example, a judge has been held to have absolute immunity from a claim of conspiracy to empanel an all-white jury in a particular criminal trial, *see White v. Bloom*, 621 F.2d 276, 279-80 (8th Cir.), *cert. denied*, 449 U.S. 995, 101 S. Ct. 533, 66 L. Ed.2d 292 (1980), but to have no such immunity from a claim of racial discrimination in the preparation of general jury lists to affect all future trials, a job that was "ministerial," *see Ex parte Virginia*, 100 U.S. (10 Otto) 339, 348, 25 L. Ed. 676 (1879). In the latter case, the judge had the responsibility of "prepar[ing] annually a list of such inhabitants of the county . . . 'as he shall think well qualified to serve as jurors, being persons of sound judgment and free from legal exception,'" *id.* at 349 (Field, J., dissenting), a task that "might as well have been

committed to a private person as to one holding the office of a judge," *id.* at 348 (majority opinion).

> The Committee's job of formulating a list of attorneys deemed qualified to represent indigent defendants accused of crimes, and its additions to or deletions from that list, bear a marked similarity to the *Ex parte Virginia* judge's responsibility for compiling a list of qualified jurors. The Committee's decisions are not related to any particular criminal prosecution. The 18-B Panel exists so that judges may select attorneys from the list who will both provide future representation to indigent defendants and receive compensation for those services. But, as discussed above, in any given case, the court may appoint an attorney who is not on the 18-B Panel. Further, even the Committee's rejection of Mitchell's individual application did not affect any particular case, for the Committee's letter of rejection stated that Mitchell was to continue to "handle to conclusion" any matter to which he was then assigned.

*Mitchell*, 377 F.3d at 174. The *Mitchell* court viewed the act of formulating a list of attorneys deemed qualified to represent indigent defendants as an inherently administrative act, regardless of whether the actor was a judge or not. It analogized this act to the preparation of an annual list of individuals eligible to serve on grand juries, which the Supreme Court in *Ex Parte Virginia*, 100 U.S. 339 (1880), found not to be a judicial act entitled to judicial immunity when performed by a judge. The *Ex Parte Virginia* decision rested on the following reasoning:

> The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. It often is given to county commissioners, or supervisors, or assessors. In former times, the selection was made by the sheriff. In such cases, it surely is not a judicial act, in any such sense as is contended for here. It is merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads. That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, [and] sheriffs [ ]. Is their election or their appointment a judicial act?

*Ex Parte Virginia*, 100 U.S. at 348.

After considering the applicable legal standard, the authorities that support each of side of the immunity question in this case, and the underlying purpose of the judicial immunity doctrine, we believe that the act of selecting applicants for inclusion on a rotating list of attorneys eligible for court appointments is inextricably linked to and cannot be separated from the act of appointing counsel in a particular case, which is clearly a judicial act, and therefore that the judges' acts at issue in this suit must be considered to be protected by judicial immunity. We disagree with the *Mitchell* court that the act of selecting qualified attorneys for inclusion on an appointment list can be rigidly separated from the act of appointing an attorney in a particular case. The appointment process must be viewed holistically. In this case, the selection of applicants for inclusion on the list and the actual appointment of attorneys in specific cases occur as part of an appointment process that cannot be divided in a principled way into judicial and administrative acts. In light of the fact that the defendant judges have very limited discretion in deciding which attorney to appoint in a specific case—they may only deviate from the rotation system for good cause—decisions about which attorneys should be placed on the wheel functionally determine which attorney actually will be appointed in a particular case. Also, the nature of the decision of whether to select an applicant for inclusion on the appointment wheel and the decision of whether to appoint an attorney in a particular case are essentially identical; in both situations, the judge must assess an attorney's competence and ability to effectively represent clients before the court. Although the selection decision is not made in the context of a specific suit, the decision will presumably be made based upon an attorneys' conduct in other cases before the court. Indeed, courts have not strictly limited judicial immunity to actions taken in the context of a specific lawsuit, and at least one court has found that acts taken completely outside the context of a specific adjudication are properly classified as judicial and protected

17

by absolute judicial immunity. *See Sparks v. Character & Fitness Comm.*, 859 F.2d 428, 434 (6th Cir. 1988) (finding that actions taken by the Kentucky Supreme Court and its Committee on Character and Fitness in denying an applicant admission to the state bar were judicial acts to which absolute immunity applied). The Supreme Court has held that the related doctrine of prosecutorial immunity, which is justified by a similar rationale and governed by similar rules, may apply to acts made outside the context of a specific lawsuit when the acts are "directly connected with the conduct of a trial" and "necessarily require legal knowledge and the exercise of related discretion." *See Van De Kamp v. Goldstein*, 129 S. Ct. 855, 858–64 (2009) (holding that prosecutorial immunity barred suit against a district attorney and his chief assistant for failing to: (1) establish an information system containing potential impeachment material about informants to ensure that deputy district attorneys complied with their constitutional obligation to disclose agreements with informants who testify at trial; and (2) adequately train or supervise deputy district attorneys concerning their obligation to disclose such information). Ultimately, the acts at issue in this case involve the performance of duties which are intimately connected to a judge's adjudicatory role, and are therefore judicial in nature.[5] *See Ballard*, 413 F.3d at 515.

The district court properly dismissed the claims against the defendant judges in their individual capacities.

## V.    Claims Against Tarrant County

The district court found that Davis had failed to state a claim against Tarrant County because the defendant judges acted on behalf of the state of Texas, not Tarrant County. Davis and the TFDP assert that the defendant

---

[5] The defendant judges clearly had jurisdiction to select applicants for inclusion on a rotating list because they were acting pursuant to an explicit statutory grant of authority in establishing and implementing a policy for the appointment of counsel in Tarrant County.

judges acted on behalf of Tarrant County in selecting applicants for inclusion on the rotating list of attorneys eligible for felony court appointments in Tarrant County because they were policymakers for Tarrant County under the Texas Fair Defense Act.

Municipal liability under 42 U.S.C. § 1983 requires proof of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). The policymaker must have final policymaking authority. *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 (1988)). "[W]hether a particular official has final policymaking authority is a question of *state law*." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citation and internal quotation marks omitted). Municipal liability cannot be sustained under a theory of respondeat superior. *Rivera*, 349 F.3d at 247 (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997); *Piotrowski*, 237 F.3d at 578). "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578.

We have held that under Texas law, "[a] local judge acting in his or her judicial capacity is not considered a local government official whose actions are attributable to the county." *Krueger v. Reimer*, 66 F.3d 75, 77 (5th Cir. 1995) (citations omitted); *see also Clanton v. Harris County, Tex.*, 893 F.2d 757, 758 (5th Cir. 1990) ("Texas district judges act for the state in appointing counsel for indigent criminal defendants, and the county is not responsible under § 1983 for their actions in this regard."); *Hamill v. Wright*, 870 F.2d 1032, 1037 (5th Cir. 1989) (stating that "Texas law makes only state court judges responsible for appointing attorneys for indigent criminal defendants" and "[a] county can

19

exercise no authority over state court judges, as the latter are not county officials"); *Clark v. Tarrant County*, 798 F.2d 736, 744 (5th Cir. 1986) (stating that Texas district judges "are undeniably state elected officials"). As discussed above, the act of selecting applicants for inclusion on a rotating list of attorneys eligible for court appointments is inextricably linked to and cannot be separated from the act of appointing counsel in a particular case, which is clearly a judicial act under Texas law. *See Clanton*, 893 F.2d at 758; *Hamill*, 870 F.2d at 1037. Because the defendant judges acted in their judicial capacities in selecting applicants for inclusion on the rotating list of attorneys eligible for felony court appointments in Tarrant County pursuant to their obligations under the Texas Fair Defense Act, Tarrant County may not be held liable for those acts.

## VI. Claims Against the Defendant Judges in their Official Capacities

The district court dismissed Davis's claims against the defendant judges in their official capacities on the ground of Eleventh Amendment immunity. Texas judges are entitled to Eleventh Amendment immunity for claims asserted against them in their official capacities as state actors. *Warnock v. Pecos County, Tex.*, 88 F.3d 341, 343 (5th Cir. 1996); *Holloway v. Walker*, 765 F.2d 517, 519 (5th Cir. 1985).

Davis has asserted a claim for prospective declaratory relief, and the Eleventh Amendment does not bar claims for prospective relief against state officials acting in their official capacity. *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974); *Ex Parte Young*, 209 U.S. 123, 155–56 (1908); *Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 321–22 (5th Cir. 2008); *Brennan v. Stewart*, 834 F.2d 1248, 1252 (5th Cir. 1988). Davis's claim for prospective declaratory relief against the defendant judges in their official capacities is not barred by the Eleventh Amendment. However, Davis's claim for prospective declaratory relief is moot because the Tarrant County guidelines in effect at the time he applied

for felony court appointments in June 2005 are no longer in effect, and Davis lacks standing to challenge the current policy.

## VII.  Conclusion

Davis has standing to challenge only his rejection under the Tarrant County guidelines in effect at the time he applied for felony court appointments in June 2005.  His claims against the defendant judges in their individual capacities are barred by the doctrine of judicial immunity.  Davis's claims against the defendant judges in their official capacities are barred by the Eleventh Amendment.  Davis has failed to state a claim against Tarrant County because the defendant judges acted in their judicial capacities in selecting applicants for inclusion on the rotating list of attorneys eligible for felony court appointments in Tarrant County. Accordingly, the judgment of the district court is AFFIRMED.