# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 21, 2012

No. 10-10905

Lyle W. Cayce
Clerk

ISYSTEMS,

Plaintiff-Appellant

v.

SPARK NETWORKS, LIMITED; SPARK NETWORKS, INCORPORATED,

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:08-CV-1175

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

PER CURIAM:[*]

Spark Networks, the owner of the "jdate.com" web domain, won the rights to ISystems's "jdate.net" domain name in arbitration. ISystems then brought suit against Spark Networks for damages and injunctive and declaratory relief under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1114(2)(D)(iv)-(v), and for civil damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). The district court dismissed the action in full for failure to state a claim under FED. R. CIV. P.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

12(b)(6) and failure to plead fraud with particularity under FED. R. CIV. P. 9(b). ISystems appeals the dismissal, as well as the denial of its request for leave to amend the First Amended Complaint. We affirm the district court's ruling on the RICO claim and on the motion for leave to amend, but we reverse and remand with respect to the ACPA claim.

## I. Background

Spark Networks, Incorporated ("Spark, Inc.") is the parent company of Spark Networks, Limited ("Spark Ltd.") (collectively "Spark defendants"). Spark Ltd. provides online personal services through various websites, including "jdate.com," which caters to the Jewish singles community. Spark Ltd.'s predecessor purchased the Internet domain name "jdate.com" on January 8, 1997, and on January 16, 2001, it registered the mark "JDate," namely for "providing a website for facilitating the introduction of individuals."

The plaintiff ISystems developed Julian date computation software, which it marketed through the Internet domain name "jdate.net." It purchased that domain name on May 21, 2001. ISystems allows an organization called the Jewish Dating Network to use a subdomain of its website, "www.jdate.net," to provide nonprofit matchmaking-related services and dating resources.

In 2003 Spark Ltd., through counsel, requested that ISystems transfer to it the domain name "jdate.net," on the ground that it was likely to cause confusion regarding Spark Ltd.'s registered "JDate" mark and "jdate.com" website. ISystems did not comply. On May 19, 2008, Spark Ltd. submitted a complaint to the National Arbitration Forum ("NAF") pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP").[1] After considering Spark Ltd.'s complaint, ISystems's response, and the submitted evidence, the arbitrator concluded (1) that the "jdate.net" domain name "is identical to a registered

---

[1] ISystems agreed to follow the UDRP in its Registration Agreement with Stargate Holdings Corporation, the registrar of its domain name.

trademark in which [Spark Ltd.] has rights"; (2) that "there is no evidence that [The Jewish Dating Network] business has been operating without knowledge by [ISystems]"; and (3) that ISystems "has registered and continues to use the disputed domain name in bad faith."  Pursuant to the arbitrator's order, the Internet Corporation for Assigned Names and Numbers ("ICANN") transferred the "jdate.net" domain name from ISystems to Spark Ltd.

On July 11, 2008, ISystems filed a complaint against the Spark defendants in federal district court.  ISystems alleged that the Spark defendants' efforts resulting in the transfer of the "jdate.net" domain name violated ACPA and RICO.  The district court granted the Spark defendants' unopposed motion to dismiss in an order on June 10, 2009, which it vacated upon ISystems's motion, but which it simultaneously replaced with a new order dismissing the case.  ISystems filed another motion to vacate and requested leave to amend its complaint, which the district court granted.  Spark defendants then moved to dismiss ISystems's First Amended Complaint, which the district court granted with prejudice.  The district court denied ISystems's subsequent motion to vacate the judgment and request for leave to amend its complaint once more.  ISystems timely appealed, and a panel of this Court resolved the appeal on its summary calendar, affirming the district court in full.[2]  This Court then granted ISystems's petition for rehearing, withdrew the prior opinion, and set the case for oral argument.

## II.  Standard of Review

"A district court's grant of a motion to dismiss is reviewed de novo, using the same standard as the district court."[3]  All factual allegations pled in the First

---

[2] *ISystems v. Spark Networks Ltd.*, 428 F. App'x 368 (5th Cir. 2011) (per curiam) (unpublished).

[3] *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 217 (5th Cir.), *cert. denied*, 130 S. Ct. 624 (2009).

Amended Complaint must be taken as true.[4]  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[5]

ISystems argues that the Court should treat the Spark defendants' motion as one for summary judgment because they rely on attachments to their motion. But ISystems's claims are based on those documents, and ISystems did not attach them to its complaint.  "'[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim.'"[6]  Thus, the motion-to-dismiss standard is the appropriate one.

### III.  Anticybersquatting Consumer Protection Act

The Anticybersquatting Consumer Protection Act, enacted in November 1999, amended the Lanham Act[7] to create a civil action for damages and injunctive relief against cybersquatters.  ISystems brought action under two of its provisions.

#### A.     15 U.S.C. § 1114(2)(D)(iv).

ISystems claims that the Spark defendants abused the NAF procedure to obtain the "jdate.net" domain name, in violation of 15 U.S.C. § 1114(2)(D)(iv). Section 1114(2)(D)(iv) provides that if a registrar transfers a domain name "based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for

---

[4] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[5] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

[6] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

[7] 15 U.S.C. §§ 1111-1128.

4

any damages." This subsection thereby "'protects the rights of domain name registrants against overreaching trademark owners.'"[8]

ISystems alleges that Spark Ltd. deceptively blacked out portions of the "www.jdate.net" webpage screen shots in its submissions to NAF.[9] ISystems contends that Spark Ltd. misrepresented "www.jdate.net" as a commercial site rather than a not-for-profit one. ISystems alleges that Spark Ltd. presented the screen-shot exhibit as a "true and correct copy of the web page which opens upon entry of www.JDATE.NET." It also alleges that an actual copy of the opening page would have identified the site as a not-for-profit resource evaluating Jewish dating services. Instead, ISystems says, the "blacked-out version . . . looked as if the site redirected visitors to other websites for profit."

This alleged misrepresentation is material. Material misrepresentations include those that would influence an arbitrator's judgment that the domain name "jdate.net" is "dilutive" of the "JDate" mark. ACPA's definition of dilution excludes noncommercial uses of a mark,[10] so the alleged disguise of the noncommercial nature of "www.jdate.net" would impact the arbitrator's assessment of whether "www.jdate.net" is "dilutive of" the "JDate" mark. In fact, the NAF explicitly relied on the lack of evidence of noncommercial use of "www.jdate.net," calling the noncommercial nature of the site "an unproven suggestion." From ACPA and the NAF's reasoning, we conclude that the alleged misrepresentation of the noncommercial nature of the "www.jdate.net" site was material. In addition, taking ISystems's assertions as true, as we must, Spark

---

[8] *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 29 (1st Cir. 2001) (quoting H.R. Conf. Rep. No. 106-464, at 117 (1999)).

[9] The original panel opinion addressed a second allegation, that Spark Ltd. misrepresented that it had a trademark on "JDate" rather than a service mark. ISystems clarified in its post-argument letter brief of December 13, 2011, that the trademark/service-mark distinction "is not the basis of ISystems' first ACPA claim, rather Spark's blacked out 'screen shot' is the issue."

[10] 15 U.S.C. § 1125(c)(3)(C).

Ltd. strategically, and therefore knowingly, blacked out the exhibit. In sum, ISystems has pleaded facts with particularity that are sufficient for the district court to proceed on its Section 1114(2)(D)(iv) claim.

### B.     15 U.S.C. § 1114(2)(D)(v).

ISystems also brings a claim requesting "[a]n order pursuant to 15 U.S.C. § 1114(2)(D)(v) establishing that Plaintiff's registration of the domain name is not unlawful." Under Section 1114(2)(D)(v), "[a] domain name registrant whose domain name has been . . . transferred . . . may . . . file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter."[11] If a registrant so establishes, a court may grant injunctive relief, including the reactivation of the domain name or transfer of the domain name to the registrant.[12] In other words, Section 1114(2)(D)(v) of ACPA "provide[s] registrants . . . with an affirmative cause of action to recover domain names lost in UDRP proceedings."[13]

To evaluate whether a plaintiff's registration or use of a domain name is unlawful, ACPA instructs courts to look for evidence of bad-faith intent to profit from the domain name.[14] ACPA "treats rights to registration and use of a domain name as contingent upon the registrant's ongoing use of the domain

---

[11] *Id.* § 1114(2)(D)(v). Because neither party briefed the question whether the result of an arbitration pursuant to the UDRP is entitled to deference in § 1114(2)(D)(v) actions, we do not address it here. We note, however, that other circuits have concluded that UDRP arbitrations are not entitled to deference in § 1114(2)(D)(v) proceedings in United States courts. *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 382-83 (2d Cir. 2003); *Hawes v. Network Solutions, Inc.*, 337 F.3d 377, 386-87 (4th Cir. 2003); *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona*, 330 F.3d 617, 626 (4th Cir. 2003); *Dluhos v. Strasberg*, 321 F.3d 365, 373-74 (3d Cir. 2003); *Sallen*, 273 F.3d at 28; *cf. S. Co. v. Dauben Inc.*, 324 F. App'x 309, 316 (5th Cir. 2009) (per curiam) (unpublished).

[12] 15 U.S.C. § 1114(2)(D)(v); *see Barcelona.com, Inc.*, 330 F.3d at 626.

[13] *Sallen*, 273 F.3d at 27.

[14] 15 U.S.C. § 1125(d)(1)(A)(i).

name without a 'bad faith intent to profit' from a mark."[15]  The statute gives courts nine non-exhaustive factors to consider in evaluating bad faith.[16]  The paradigmatic case of bad-faith intent to profit involves a registrant who "essentially [holds] hostage a domain name that resemble[s] a mark with the intention of selling it back to the mark's owner."[17]  Other examples include registering "well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site," and targeting "'distinctive marks to defraud consumers, including to engage in counterfeiting activities.'"[18]

ISystems alleges that it acquired the domain "jdate.net" for the "sole purpose" of "marketing . . . their JDATE software."  According to the First Amended Complaint, "[t]he marketing of ISYSTEMS' JDATE software has always been the only commercial use of the jdate.net domain."  Further, it is difficult to conclude from the allegations that ISystems's use of the mark "JDate" to market its software was somehow predatory with respect to the Spark defendants' business.  At least since the 1990s, JDATE has been a common term in computing that refers to "Julian date" – that is, the number of days since January 1, 0000.  ISystems's software package, called JDate, allows computer programmers to easily perform date computations.

Unlike many websites, ISystems was not using its "www" subdomain (that is, "www.jdate.net") for its marketing.  A "charitable organization of

---

[15] *Storey*, 347 F.3d at 378; *see TMI, Inc. v. Maxwell*, 368 F.3d 433, 436 (5th Cir. 2004).

[16] 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).  "The first four factors have been seen as reasons why a defendant might in good faith have registered a domain name incorporating someone else's mark, and the other five are indicia of bad faith intent."  *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 785 (8th Cir. 2004).  "The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit."  *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004).

[17] *TMI*, 368 F.3d at 439.

[18] *Id.* at 439 n.8 (quoting *Lucas Nursery*, 359 F.3d at 809).

matchmakers for the Jewish community" calling themselves the "Jewish Dating Network" approached ISystems about using the "www" subdomain, and ISystems agreed. According to the First Amended Complaint, visitors to "www.jdate.net" were "greeted by the distinct JEWISH DATING NETWORK logo, and a no-nonsense statement that the group is not-for-profit, and evaluates the best and worst Jewish dating websites and services." The Network is a nonprofit, receives no compensation for operating the site, and paid nothing to ISystems for the use of the "www" subdomain.

In addition to alleging that ISystems received no revenue from the Jewish Dating Network's operations, the First Amended Complaint alleges that the similarity with "jdate.com" did not benefit its marketing of JDate software: "The Plaintiff's JDate Expression Calculator has no profit from the Jewish or singles scenes, and thus no profit what-so-ever relating to the Defendant's alleged service mark registration for providing a computerized website service for introducing individuals." Nor do we find any indication in the record that the "www.jdate.net" page linked to the other subdomains where ISystems marketed its software products.

The First Amendment Complaint alleges that ISystems's only intention in selecting the domain name was to market its software product of the same name, which it selected because "JDATE" is a common term in the computer programming industry for the function performed by its software. ISystems contends that it sought no advantage from any similarity to "jdate.com," as its software product bears no relationship to a dating service. Although the Jewish Dating Network eventually used a subdomain of the site, the use was noncommercial and contributed no profits to ISystems, either directly or indirectly.

Taking these allegations as true, we are persuaded that the pleaded facts sufficiently allege a lack of bad faith intent to profit from the "JDate" service mark. ISystems has alleged a claim that its registration and use of "jdate.net"

is not unlawful under 15 U.S.C. § 1114(2)(D)(v) that is sufficient to survive a motion to dismiss.

## IV.  Civil RICO

ISystems failed, however, to allege facts that could establish that the Spark defendants violated RICO, because it did not allege a proper RICO "enterprise."

The RICO Act provides, in relevant part, that:

> it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.[19]

In other words, "a person who is employed by or associated with an enterprise cannot conduct the enterprise's affairs through a pattern of racketeering."[20] RICO defines "enterprise" as including "any individual, partnership, corporation, association, or other alleged legal entity, and any union or group of individuals associated in fact although not a legal entity."[21]  The Supreme Court explained in *Cedric Kushner Promotions, Ltd. v. King* that, "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."[22]

ISystems attempts to connect Spark Inc., the alleged RICO "person," to a distinct RICO "enterprise."  ISystems argues that Spark Ltd. – which is Spark Inc.'s wholly owned subsidiary – is a RICO "enterprise" because under *Cedric Kushner Promotions*, a formal separation such as incorporation is a sufficient

---

[19] 18 U.S.C. § 1962(c).

[20] *In re Burzynski*, 989 F.2d 733, 741 (5th Cir. 1993).

[21] 18 U.S.C. § 1961(4).

[22] 533 U.S. 158, 161 (2001).

distinction between the RICO "enterprise" and the RICO "person."[23]   *Cedric Kushner Promotions* actually involved a scenario reversed from the one here.  In that case, an employee (the RICO "person") illegally conducted the affairs of the corporation (the RICO "enterprise").   Here, the corporation is the alleged "person," and *Cedric Kushner Promotions* expressly declined to address such arrangements.  In particular, the Court distinguished a scenario in which "a corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise,'" noting that "[i]t is less natural to speak of a corporation as 'employed by' or 'associated with' this latter oddly constructed entity."[24] This Court has since held in *Whelan v. Winchester Production Co.* that in making a distinction between a RICO "person" and a RICO "enterprise," "[i]t is not enough to establish that a defendant corporation through its agents committed the predicate acts in the conduct of its own business.  That officers or employees of a corporation, in the course of their employment, associate to commit predicate acts does not establish an association-in-fact enterprise distinct from the corporation."[25]

Here, ISystems pled that Spark Inc. controlled Spark Ltd.  As in *Whelan*, ISystems fails to show that the alleged RICO "enterprise" exists, because it does not allege that Spark Ltd. did anything beyond carrying out the regular business of Spark Inc.[26]  In fact, it expressly conflates the two in describing their conduct.

---

[23] 533 U.S. at 164.

[24] *Id.*

[25] 319 F.3d 225, 229 (5th Cir. 2003).

[26] *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993) ("[I]t is . . . theoretically possible for a parent corporation to be the defendant and its subsidiary to be the enterprise under section 1962(c). However, the plaintiff must plead facts which, if assumed to be true, would clearly show that the parent corporation played a role in the racketeering activity which is distinct from the activities of its subsidiary. A RICO claim under section 1962(c) is not stated where the subsidiary merely acts on behalf of, or to the benefit of, its parent."); *Brown v. Coleman Invs., Inc.*, 993 F. Supp. 416, 428 (M.D. La. 1998) ("In order to properly plead an enterprise, Brown must plead facts showing how the parent corporation . . . played a role in

10

The First Amended Complaint states that "[a]ctions taken by Spark Limited complained of herein are . . . alleged to have been taken by Spark Inc., through its control of Spark LTD." And in many cases the First Amended Complaint fails to distinguish the entities at all, as it refers to them collectively as "Spark Networks," "Sparks," or "defendants." ISystems cannot avoid the distinctiveness requirement "'by alleging a RICO enterprise that consists merely of a corporation defendant associated with its own employees or agents carrying on the regular affairs of the defendants.'"[27] Not every wholly owned and controlled subsidiary is an agent of its parent,[28] but ISystems's failure to plead any functional separation between the two dooms its RICO claim. ISystems failed to allege a sufficiently distinct RICO "enterprise" and therefore an actionable RICO claim.

## V. Denial of Request for Leave To Amend

ISystems contends that the district court abused its discretion by rejecting ISystems's second request to amend its complaint "without providing any justifying reason." The Spark defendants counter that ISystems never properly requested leave to amend: in its opposition to the Spark defendants' second motion to dismiss, ISystems did not request leave to amend its complaint, and "[a]t no time did ISystems articulate what further amendments it could make to the First Amended Complaint in order to cure all of the defects."

"Except as authorized by the first sentence of Fed. R. Civ. P. 15(a) for one amendment before service of a responsive pleading, a complaint may be

---

the racketeering activity that is distinct from the acts of the subsidiary . . . .").

[27] *Khurana v. Innovative Health Care Sys.*, 130 F.3d 143, 155 (5th Cir. 1997) (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)), *vacated on other grounds sub nom. Teel v. Khurana*, 525 U.S. 979 (1998).

[28] *See Nat'l Carbide Corp. v. Comm'r*, 336 U.S. 422, 429 (1949) (holding, in an income-tax context, that a wholly owned subsidiary that is completely controlled by its parent is not necessarily the parent's agent), *cited in Bramblett v. Comm'r*, 960 F.2d 526, 532 (5th Cir. 1992).

amended only by leave of the district court, and, while such leave is to be freely given when justice so requires, the decision is left to the sound discretion of the district court and will only be reversed on appeal when that discretion has been abused."[29] "Permissible reasons for denying a motion for leave to amend include 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of the amendment, etc.'"[30] This Court "generally will not construe unelaborated, nested requests for amendment as motions to amend,"[31] and "'[w]hen the reason for the denial is readily apparent, . . . a district court's failure to explain adequately the basis for its denial is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend.'"[32]

ISystems did not seek leave to amend its First Amended Complaint until it moved the district court to vacate its order granting the Spark defendants' second motion to dismiss. ISystems's request, in full, was, "to the extent this Court has dismissed the case because plaintiff did not label specific facts as being cited to specific elements of the law, plaintiff can certainly do so."

Several reasons justify the district court's denial of ISystems's request. For one, the request was "unelaborated" and "nested" in the prayer section of a motion to vacate a prior order dismissing the case, so this Court need not even

---

[29] *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 387 (5th Cir. 2003).

[30] *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

[31] *Id.*

[32] *Id.* (quoting *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004)).

construe the request as a motion for leave to amend.[33]  If it does, though, then the motion was almost certainly unduly delayed, as well as a repeated attempt to cure deficiencies not cured by previously allowed amendments.  The district court had already granted ISystems leave to amend the complaint once, and ISystems never explained why it had delayed seeking leave to amend the First Amended Complaint until the district court had granted the second motion to dismiss.  For these reasons, the district court acted within its sound discretion in denying ISystems's request to amend the First Amended Complaint.

## VI.  Conclusion

The district court's dismissal of ISystems's ACPA claims is REVERSED, and the case is REMANDED for further proceedings on those claims.  The dismissal of the RICO claim and the denial of the motion for leave to amend the First Amended Complaint are AFFIRMED.

---

[33] *Cent. Laborers' Pension Fund*, 497 F.3d at 556; *cf. Humana Health Plan of Texas Inc.*, 336 F.3d at 387 ("'[A] bare request in an opposition to a motion to dismiss – without any indication of the particular grounds on which the amendment is sought – does not constitute a motion within the contemplation of Rule 15(a).'" (alteration in original) (citation omitted) (quoting *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993)).